## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

ESTATE OF ABDOUL "MALICK" SILLAH
by its Special Administrator,
Paula Carter,

               Plaintiff,

STATE OF WISCONSIN
DEPARTMENT OF HEALTH AND
FAMILY SERVICES,

               Involuntary Plaintiff,

  v.

CITY OF MADISON, a body politic,
DANE COUNTY, a body politic,
JOHN BAUMAN, individually, and in his
official capacity as Dane County Juvenile
Court Administrator,
EDJRON PEARSON, individually, and in his
official capacity as Dane County Juvenile
Detention Superintendent,
THOMAS DAHMS, individually,
HALEY MASSEY, individually,
SARAH LAWRENCE, individually,
JAVIER LOREDO, individually,
KURT WEGE, individually,
BRITTNEY LATHROP, individually,
CATHERINE MARINO, individually,
ELIJAH MISENER, individually,
CHRISTOPHER DORNAN, individually,
JOEL STELTER, individually,
REBECCA LINDSEY, individually,
JANE DOE 3, individually,
AMBER BROZEK, individually,
NORBERT SCHAETZ, individually,
AKOUVI NOFODJI, individually,
RYAN MOORAD, individually,
MELISA MENDOZA, individually,
JEFF MEEK, individually,
JOHN DOE 1, individually,
JOHN DOE 2, individually,

**COMPLAINT**
Civil Action No. 23-cv-96
[Trial By Jury Demanded]

Defendants.

## I. __INTRODUCTION__

1.      The most fundamental goal of the juvenile justice system is the protection of children, family, and the public interest.

2.      This is a civil rights action for damages brought under 42 U.S.C § 1983 by the Estate of Abdoul Malick Sillah. Mr. Sillah, hereinafter "Malick" as he was known, who was 16 years-old at the time of his death, was injured and died from multiple drug overdoses that occurred while in custody after he was transported to the Dane County Juvenile Reception Center ("JRC") by City of Madison Police officers. All individual defendants failed to remove dangerous drugs including extended-release morphine, Oxycodone, Xanax, Sertraline, and Vyvanse from Malick's person, and they failed to notify medical personnel regarding all of these medications in Malick's possession. Custody of Malick was dropped on February 11, 2020, and he died in his bed at home that same day from drugs he had taken at Dane County Juvenile Reception Center.

## II. __JURISDICTION AND VENUE__

3.      This Court has original jurisdiction over this matter under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4). Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of Plaintiff's claims arose in this Judicial District (Dane County, Wisconsin).

## III. __PARTIES__

4.      The plaintiff is the Estate of Abdoul Malick Sillah (hereinafter "Estate"), acting through its court-appointed Special Administrator, Paula Carter, appointed by Dane County Circuit Court. Malick was a 16 year-old resident of the State of Wisconsin when he died on February 11, 2020.

5.      Subrogated Involuntary Plaintiff State of Wisconsin-Department of Health Services (hereinafter "WI DHS") operates and administers the state's Medicaid program a/k/a Title XIX and BadgerCare Plus, and may have paid certain hospital, medical, and related expenses on Mr. Sillah's behalf and may claim to be subrogated to his estate's rights and is, therefore, joined as an involuntary plaintiff. The Estate seeks a determination as to the extent and nature of any subrogation and/or reimbursement rights of said involuntary plaintiff.

6.      The City of Madison, Wisconsin is a body politic, organized under the laws of the State of Wisconsin, whose address is 210 Martin Luther King Jr. Blvd., Madison, Wisconsin, 53703. The City of Madison operates and controls the City of Madison Police Department pursuant to its official policies, practices, and customs. The City of Madison is liable for the acts and omissions described herein by Officers Thomas Dahms, Haley Massey, Sarah Lawrence, Javier Loredo, Kurt Wege, Brittney Lathrop, Catherine Marino, Elijah Misener, Christopher Dornan, Joel Stelter, Rebecca Lindsey, and/or Jane Doe 3, which were committed within the scope of their respective employment. The City of Madison is also liable for the acts and omissions of its employees and agents because its policies, practices, and customs caused the complained-of violations asserted herein. The City of Madison is required by law, pursuant to Wis. Stats. § 895.46(1)(a), to pay and indemnify all judgments, including compensatory and punitive damages, attorney's fees, and costs awarded against its officials, employees, and agents.

7.      Dane County, Wisconsin is a body politic, organized under the laws of the State of Wisconsin, whose address is 210 Martin Luther King Jr. Blvd., Madison, Wisconsin, 53703. Dane County operates and controls the Juvenile Reception Center and the Juvenile Detention Center (hereinafter "JRC" or "JRC/Juvenile Detention") pursuant to its official policies, practices, and customs. Dane County is liable for the acts and omissions described herein by John Bauman,

3

Edjron Pearson, Amber Brozek, Norbert Schaetz, Akouvi Nofodji, Ryan Moorad, Melisa Mendoza, Jeff Meek, John Doe 1, and/or John Doe 2, which were committed within the scope of their respective employment. Dane County is also liable for the acts and omissions of its employees and agents because its policies, practices, and customs caused the complained-of violations asserted herein. Dane County is required by law, pursuant to Wis. Stats. § 895.46(1)(a), to pay and indemnify all judgments, including compensatory and punitive damages, attorney's fees, and costs awarded against its officials, employees, and agents.

8.      Defendant John Bauman (hereinafter "Bauman") was the Dane County Juvenile Court Administrator at the Juvenile Reception Center at all times relevant hereto. He is sued in his official and individual capacities. At all times relevant hereto Mr. Bauman acted under color of law and within the scope of his employment.

9.      Defendant Edjron Pearson (hereinafter "Pearson") was the Dane County Juvenile Detention Superintendent at all times relevant hereto. He is sued in his official and individual capacities. At all times relevant hereto Mr. Pearson acted under color of law and within the scope of his employment.

10.     Defendant Thomas Dahms (hereinafter "Dahms") was and is an adult citizen residing in the State of Wisconsin, and was employed by the City of Madison, Wisconsin as a Madison Police Department police officer at all times relevant hereto. Defendant Dahms is sued in his individual capacity. Defendant Dahms acted under color of state law and within the scope of his employment with the City of Madison, Wisconsin Police Department at all times relevant hereto.

11.     Defendant Haley Massey (hereinafter "Massey") was and is an adult citizen residing in the State of Wisconsin, and was employed by the City of Madison, Wisconsin as a

4

Madison Police Department police officer at all times relevant hereto. Defendant Massey is sued in her individual capacity. Defendant Massey acted under color of state law and within the scope of her employment with the City of Madison, Wisconsin Police Department at all times relevant hereto.

12.     Defendant Sarah Lawrence (hereinafter "Lawrence") was and is an adult citizen residing in the State of Wisconsin, and was employed by the City of Madison, Wisconsin as a Madison Police Department police officer at all times relevant hereto. Defendant Lawrence is sued in her individual capacity. Defendant Lawrence acted under color of state law and within the scope of her employment with the City of Madison, Wisconsin Police Department at all times relevant hereto.

13.     Defendant Javier Loredo (hereinafter "Loredo") was and is an adult citizen residing in the State of Wisconsin, and was employed by the City of Madison, Wisconsin as a Madison Police Department police sergeant at all times relevant hereto. Defendant Loredo is sued in his individual capacity. Defendant Loredo acted under color of state law and within the scope of his employment with the City of Madison, Wisconsin Police Department at all times relevant hereto.

14.     Defendant Kurt Wege (hereinafter "Wege") was and is an adult citizen residing in the State of Wisconsin, and was employed by the City of Madison, Wisconsin as a Madison Police Department police sergeant at all times relevant hereto. Defendant Wege is sued in his individual capacity. Defendant Wege acted under color of state law and within the scope of his employment with the City of Madison, Wisconsin Police Department at all times relevant hereto.

15.     Defendant Brittney Lathrop (hereinafter "Lathrop") was and is an adult citizen residing in the State of Wisconsin, and was employed by the City of Madison, Wisconsin as a Madison Police Department police officer at all times relevant hereto. Defendant Lathrop is sued

in her individual capacity. Defendant Lathrop acted under color of state law and within the scope of her employment with the City of Madison, Wisconsin Police Department at all times relevant hereto.

16.    Defendant Catherine Marino (hereinafter "Marino") was and is an adult citizen residing in the State of Wisconsin, and was employed by the City of Madison, Wisconsin as a Madison Police Department police officer at all times relevant hereto. Defendant Marino is sued in her individual capacity. Defendant Marino acted under color of state law and within the scope of her employment with the City of Madison, Wisconsin Police Department at all times relevant hereto.

17.    Defendant Elijah Misener (hereinafter "Misener") was and is an adult citizen residing in the State of Wisconsin, and was employed by the City of Madison, Wisconsin as a Madison Police Department police officer at all times relevant hereto. Defendant Misener is sued in his individual capacity. Defendant Misener acted under color of state law and within the scope of his employment with the City of Madison, Wisconsin Police Department at all times relevant hereto.

18.    Defendant Christopher Dornan (hereinafter "Dornan") was and is an adult citizen residing in the State of Wisconsin, and was employed by the City of Madison, Wisconsin as a Madison Police Department police officer at all times relevant hereto. Defendant Dornan is sued in his individual capacity. Defendant Dornan acted under color of state law and within the scope of his employment with the City of Madison, Wisconsin Police Department at all times relevant hereto.

19.    Defendant Joel Stelter (hereinafter "Stelter") was and is an adult citizen residing in the State of Wisconsin, and was employed by the City of Madison, Wisconsin as a Madison Police

Department police officer at all times relevant hereto. Defendant Stelter is sued in his individual capacity. Defendant Stelter acted under color of state law and within the scope of his employment with the City of Madison, Wisconsin Police Department at all times relevant hereto.

20.     Defendant Rebecca Lindsey (hereinafter "Lindsey") was and is an adult citizen residing in the State of Wisconsin, and was employed by the City of Madison, Wisconsin as a Madison Police Department police officer at all times relevant hereto. Defendant Lindsey is sued in her individual capacity. Defendant Lindsey acted under color of state law and within the scope of her employment with the City of Madison, Wisconsin Police Department at all times relevant hereto.

21.     Upon information and belief, defendant Jane Doe 3 (hereinafter "Jane Doe 3" or "Doe 3") was and is an adult citizen residing in the State of Wisconsin, and was employed by the City of Madison, Wisconsin as a Madison Police Department police officer with presently unknown rank at all times relevant hereto. Defendant Jane Doe 3 is sued in her individual capacity. Defendant Jane Does 3 acted under color of state law and within the scope of her employment with the City of Madison, Wisconsin Police Department at all times relevant hereto. Following is a screenshot of Jane Doe 3 taken from video footage from the death investigation following Malick's death. Jane Doe 3 is identified by photograph because the City of Madison and its agents and employees have refused to identify her and/or produce records that would identify her.



22.     Defendant Amber Brozek (hereinafter "Brozek") was and is an adult citizen residing in the State of Wisconsin, and was employed by Dane County as a Juvenile Court Counselor at all times relevant hereto. Defendant Brozek is sued in her individual capacity. Defendant Brozek acted under color of state law and within the scope of her employment with Dane County at all times relevant hereto.

23.     Defendant Norbert Schaetz (hereinafter "Schaetz") was and is an adult citizen residing in the State of Wisconsin, and was employed by Dane County as a Juvenile Court Counselor at all times relevant hereto. Defendant Schaetz is sued in his individual capacity. Defendant Schaetz acted under color of state law and within the scope of his employment with Dane County at all times relevant hereto.

24.     Defendant Akouvi Nofodji, also known as first name "Marie" or "Maria" and/or last name "Nofibji" (hereinafter "Nofodji") was and is an adult citizen residing in the State of Wisconsin, and was employed by Dane County as a Juvenile Court Worker at all times relevant hereto. Defendant Nofodji is sued in her individual capacity. Defendant Nofodji acted under color of state law and within the scope of her employment with Dane County at all times relevant hereto.

25.     Defendant Ryan Moorad (hereinafter "Moorad") was and is an adult citizen residing in the State of Wisconsin, and was employed by Dane County as a Juvenile Court Detention Worker at all times relevant hereto. Defendant Moorad is sued in his individual capacity. Defendant Moorad acted under color of state law and within the scope of his employment with Dane County at all times relevant hereto.

26.     Defendant Melisa Mendoza (hereinafter "Mendoza") was and is an adult citizen residing in the State of Wisconsin, and was employed by Dane County as a Juvenile Court Worker at all times relevant hereto. Defendant Mendoza is sued in her individual capacity. Defendant Mendoza acted under color of state law and within the scope of her employment with Dane County at all times relevant hereto.

27.     Defendant Jeff M, upon information and belief Jeff Meek (hereinafter "Meek"), was and is an adult citizen residing in the State of Wisconsin, and was employed by Dane County as a Juvenile Court Detention Worker at all times relevant hereto. Defendant Meek is sued in his individual capacity. Defendant Meek acted under color of state law and within the scope of his employment with Dane County at all times relevant hereto.

28.     Defendant John Doe 1 (hereinafter "John Doe 1" or "Doe 1") was and is an adult citizen residing in the State of Wisconsin, and was employed by Dane County at the Juvenile Reception Center/Juvenile Detention Center with a currently unknown title at all times relevant hereto. Defendant John Doe 1 is sued in his individual capacity. Defendant John Doe 1 acted under color of state law and within the scope of his employment with Dane County at all times relevant hereto. Following is a screenshot of John Doe 1 taken from video footage from the death investigation following Malick's death. John Doe 1 is identified by photograph because Dane

County and its agents and employees have refused to identify him and/or produce records which would identify him.



29.    Defendant John Doe 2 (hereinafter "John Doe 2" or "Doe 2") was and is an adult citizen residing in the State of Wisconsin, and was employed by Dane County at the Juvenile Reception Center/Juvenile Detention Center with a currently unknown title at all times relevant hereto. Defendant John Doe 2 is sued in his individual capacity. Defendant John Doe 2 acted under color of state law and within the scope of his employment with Dane County at all times relevant hereto. Following is a screenshot of John Doe 2 taken from video footage from the death investigation following Malick's death. John Doe 2 is identified by photograph because Dane County and its agents and employees have refused to identify him and/or produce records which would identify him.



## IV. <u>STATEMENT OF FACTS</u>

**A.**    <u>**Abdoul Malick Sillah**</u>

30.    At the time of his death, Malick was 16 years-old.

31.    During his childhood, Malick was diagnosed with several mental health conditions, which resulted in difficulties in school and at home.

32.    Malick's difficulties at school resulted in his going between online school and in-person learning. At the time of the events that follow, Malick's family was working toward returning him to in-person school at the Sun Prairie School District.

33.    At times during his childhood, Malick had been in the juvenile justice system. At the time of his death, he was under supervision, through his 17th birthday, for a prior juvenile case.

**B.**    <u>**The Murder of Close Family Friend Aaron Johnson and its Impact on Malick.**</u>

34.     Aaron Johnson, age 22, was murdered at his home in Madison at approximately 3:46 PM on Saturday, February 8, 2020.

35.     Mr. Johnson had become close friends with Malick's older brother, Alex, and became like another brother to Malick, spending significant amounts of time with him, and at times living with the family.

36.     Mr. Johnson's murder was devastating to Malick's entire family and was particularly traumatizing to Malick.

**C.      Madison Police Department's Response to Requests for Assistance for Malick.**

37.     On February 10, 2020, Malick was staying at his grandmother's house. After attending a meeting regarding school that morning, Malick physically broke and pried open his grandmother's safe, which contained her prescription medications, including extended-release morphine, Oxycodone, and Xanax.

38.     At the time, Malick was severely distressed over the murder of Mr. Johnson, which had occurred approximately one and one-half days earlier.

39.     Malick was not prescribed extended-release morphine, Oxycodone, or Xanax.

40.     Unbeknownst to his grandparents, Malick took possession of the dangerous prescription medications, after which he asked to go to his mother's house to spend time with her.

41.     At around noon, Malick's mother, Paula Carter (hereinafter "Ms. Carter" or "Carter"), picked up Malick and took him shopping to have memorial shirts made for the candlelight vigil for Mr. Johnson, which was scheduled to take place that evening at 7:00 PM on February 10, 2020.

42.     Ms. Carter noticed that Malick's behavior began to change at approximately 4:00 PM.

43.     While Ms. Carter and Malick were discussing his change in behavior, Malick confided in his mother that he was feeling really sad and messed up about Mr. Johnson's death and had taken Xanax to help cope with the pain.

44.     Ms. Carter was unaware of the fact that Malick had other prescription pills on his person.

45.     By 5:30 or 6:00 PM, Malick's behavior had further deteriorated, and he was acting unlike his usual self.

46.     Ms. Carter told Malick that he would have to stay home from the vigil for Mr. Johnson because of his present condition.

47.     While Ms. Carter was at the vigil she received word from Era Ukmata, the girlfriend of Malick's brother, that Malick had a bag of pills.

48.     Upon learning of this, Ms. Carter contacted her mother/Malick's grandmother, Donna Skaro, and asked her to check her safe for her medications.

49.     Ms. Skaro found her safe broken and pried open and discovered that many of her prescription medications were missing. She relayed this information to Ms. Carter.

50.     Ms. Carter then returned home at approximately 8:30 PM to find that Malick had trashed her house and was acting irate, accusing the family of stealing his pills. Ms. Carter found that Malick had made attempts to break into her safe but had not yet gotten to the contents.

51.     Malick's condition had further deteriorated from when Ms. Carter last saw him before the 7:00 PM vigil; he was not acting like himself, and he was making threats to his family.

52.     The family tried to calm Malick down and convince him that they had not taken anything from him, but Malick only became more agitated and aggressive.

53.     Fearing for Malick's safety and the safety of the family, Ms. Carter called 911, and while on the phone with the 911 operator, Malick broke into her safe and removed full prescription bottles of Vyvanse and Sertraline, both of which had been prescribed to Malick.

54.     At some point after Ms. Carter returned home, Malick located the pills he had taken from Ms. Skaro's house and hid the bag in his underwear.

55.     Malick then ran out of the house.

56.     At approximately 8:25 PM, while acting in the course and scope of their employment with the City of Madison Police Department, defendant Massey, and defendant Lawrence were dispatched to respond to Ms. Carter's emergency call.

57.     Upon arrival at Ms. Carter's home, located at 4528 Milwaukee Street, Madison, Wisconsin, Ms. Carter informed the officers that she had learned that Malick was in possession of a bag of pills and prescription bottles, which contained extended-release morphine, Oxycodone, Xanax, Vyvanse, and Sertraline.

58.     Ms. Carter also informed officers that Malick was on drugs, which she knew because he was acting unlike his usual self and was acting violently.

59.     Ms. Carter also informed officers that she believed Malick had taken Xanax, and she further informed them that she thought he would get violent if officers left Malick at the home.

60.     At all times relevant hereto, all officers on scene were aware that Xanax was a controlled substance that required a prescription from a physician.

61.     At all times relevant hereto, all officers on scene were aware that Xanax and the other prescription medications in Malick's possession were dangerous when not used as prescribed and/or when not used by the person to whom they were prescribed.

62.    Ms. Carter informed officers that she believed Malick would have hidden the bag of pills in his underwear near his groin.

63.    Defendants Massey and Lawrence located Malick, and defendant Massey walked back to Ms. Carter's house with him.

64.    During the walk, Malick informed defendant Massey that his "brother" was shot and killed in the last few days and that he and his family were having a hard time with the loss.

65.    Defendant Massey was aware that Malick was referring to Aaron Johnson when he referred to his "brother."

66.    Malick told defendant Lawrence that he had already taken the pills, implying that he no longer possessed the bag of pills.

67.    Malick told defendant Massey that his mother had found a pill and had gotten mad at him.

68.    Malick told defendant Massey that he was not on any drugs.

69.    Upon information and belief, defendant Massey did not believe Malick's statement that he was not on any drugs.

70.    At all times during this interaction with defendant Massey, Malick possessed a bag of pills that included extended-release morphine, Oxycodone, and Xanax.

71.    Malick also possessed one or more plastic prescription drug bottle(s), a package of cigarillos, and a small wrench.

72.    Malick returned to Ms. Carter's house with officers, but became more and more agitated, escalating the interaction with officers.

73.     Fearing for Malick's safety, and for the safety of herself and her family, Ms. Carter told officers that if they left Malick at the house he would likely escalate the situation and that she was in favor of him being taken to JRC for everyone's safety.

74.     Malick admitted to defendant Lawrence that he had possessed the pills that Ms. Carter reported he had possessed.

75.     City of Madison Police Officer defendant Dahms and City of Madison Police Sergeant defendant Loredo were dispatched to assist with Malick's arrest due to concerns about Malick becoming violent during his arrest.

76.     Malick physically resisted arrest, but he was eventually handcuffed and arrested for disorderly conduct contrary to Wis. Stat. § 947.01 and resisting/obstructing an officer contrary to Wis. Stat. § 946.41(1).

77.     All defendants on scene at the time of the arrest were aware that Malick was in possession of a bag of dangerous prescription medications that included medications that were not prescribed to Malick and prescription medications in pill bottles.

78.     All defendants on scene at the time of arrest were aware that Malick was likely transporting the dangerous prescription drugs in his underwear.

79.     All defendants on scene at the time of the arrest were aware that Malick had ingested one or more dangerous prescription medications that were not prescribed to Malick.

80.     All defendants on scene at the time of the arrest were aware that failure to retrieve the prescription drugs from his person substantially increased the likelihood that Malick would be further injured or killed as a result of taking additional pills.

81.     All defendants on the scene at the time of the arrest were aware that Malick was experiencing distress as a result of the murder of Mr. Johnson.

82.    Defendant Lawrence determined that Malick's groin area should be frisked in a search incident to arrest because she was aware of the likelihood of his possession of prescription drugs in his groin area.

83.    Defendants Massey, Dahms, and Loredo concurred with defendant Lawrence's determination that Malick's groin area should be frisked in a search incident to arrest because of the likelihood of his possession of prescription drugs in his groin area.

84.    At no time did defendants Massey, Lawrence, or Dahms, Loredo remove the bag of drugs and pill bottles including extended-release morphine, Oxycodone, Xanax, Vyvanse, and Sertraline from Malick's person.

85.    No defendant on the scene at the time of the arrest ever located the bag of drugs and pill bottles containing extended-release morphine, Oxycodone, Xanax, Vyvanse, and Sertraline, despite the fact that they were on Malick's person.

86.    No officer on scene at the time of the arrest sought permission to conduct a search thorough enough to locate the bag and bottle of prescription pills on Malick's person, despite knowing that such searches would decrease the chances of further harm or death to Malick.

87.    Defendant Massey falsely reported that defendant Lawrence completed a search of Malick before transporting him to JRC.

88.    Defendant Massey contacted JRC and spoke with defendant Brozek, Juvenile Court Counselor, who agreed that JRC would accept custody of Malick.

89.    After arresting Malick, officers transported him to JRC.

90.    During transport to JRC, Malick's demeanor and condition began to change and deteriorate because of the drugs he had ingested, and defendants Massey, Lawrence, Dahms, and

Loredo failed to obtain medical clearance or obtain medical attention for Malick despite his serious medical needs.

91.     Despite Malick becoming less physical and resistive because of his change in condition and deterioration, defendants Massey, Lawrence, Dahms, and Loredo failed to fingerprint and photograph Malick, even though they knew that doing so would provide further opportunity for officers to locate and retrieve the dangerous prescription drugs on Malick's person.

92.     Defendant Massey falsely documented that Malick could not be fingerprinted and photographed prior to transporting him to JRC.

93.     Defendant Lawrence received a call from Juvenile Court Counselor, defendant Brozek asking whether Malick would need to be medically cleared due to Ms. Carter's statements that she believed Malick had ingested pills.

94.     Defendant Lawrence knew that if Malick needed medical clearance before JRC accepted and received him, she and the other defendant officers would have to transport Malick to the hospital or arrange for his transport, remain with him during the medical clearance process, and complete more extensive reports than would otherwise be necessary.

95.     Acting objectively unreasonably and with deliberate indifference to Malick's serious medical needs, defendant Lawrence falsely informed defendant Brozek that Malick displayed "no specific behavioral indications" to "indicate he had ingested any pills."

96.     During that same call defendant Lawrence falsely told defendant Brozek that Malick denied taking any pills, when in fact Malick told Defendant Lawrence that he had taken the pills and Ms. Carter informed her and other officers that Malick was acting like he was on drugs based on her past observation of Malick while he was under the influence.

97.     Moreover, upon information and belief, Defendant Lawrence and the other defendant officers were trained and had experience to know that a minor suspect or arrestee who had ingested and still possessed prescription drugs that were not prescribed to them, was likely to lie about the ingestion and possession of the prescription drugs.

98.     In the alternative to the preceding paragraph regarding minor suspects and arrestees who had ingested and still allegedly possessed prescription drugs, upon information and belief, the City of Madison had a custom, policy, and/or practice of failing to train its officers to scrutinize minor suspects or arrestees who had ingested and still allegedly possessed prescription drugs that were not prescribed to them.

99.     In violation of the City of Madison Police Department Standard Operating Procedure titled "Detox, JRC, Jail, and Probation & Parole Responses & Conveyances," (Eff. Date 01/15/2020), defendants Massey, Lawrence, Dahms, and Loredo failed conduct or arrange for an assessment of Malick.

100.    In violation of the City of Madison Police Department Standard Operating Procedure titled "Detox, JRC, Jail, and Probation & Parole Responses & Conveyances," (Eff. Date 01/15/2020), defendants Massey, Lawrence, Dahms, and Loredo failed to convey Malick to a medical facility for medical clearance and/or medical evaluation, despite their knowledge that Malick needed medical clearance, treatment, and medical evaluation.

101.    No supervisor or commanding officer approved a deviation from City of Madison Police Department Standard Operating Procedure titled "Detox, JRC, Jail, and Probation & Parole Responses & Conveyances," (Eff. Date 01/15/2020), with respect to Malick's custody and care.

**D.    Malick at JRC and Subsequent Transport to Hospital.**

102.    Staff members of the JRC are responsible for screening of children taken into custody.

103.    JRC safety rules do not allow juveniles in its care and custody to possess prescription drugs while in custody.

104.    JRC staff do not have authority to deviate from the above JRC safety rule relating to drugs in possession of juveniles.

105.    Defendants Lawrence, Massey, and Dahms arrived at JRC with Malick shortly after 9:30 PM on February 10, 2020.

106.    Defendants Lawrence, Massey, and Dahms had Malick in handcuffs and a spit hood when they arrived at JRC.

107.    At that time Malick continued to possess a bag of drugs and pill bottles including extended-release morphine, Oxycodone, Xanax, Vyvanse, and Sertraline.

108.    Defendants Lawrence, Massey, and Dahms personally observed, while Malick was in their custody, including but not limited to upon arrival at JRC, that Malick was lethargic, had trouble walking, had trouble standing up on his own, had to lean against walls, had trouble holding his head up, had to be steadied to avoid falling out of a chair, had difficulty taking off his coat and sweatshirt, and that his condition had noticeably deteriorated from when they first came into contact with him.

109.    At all relevant times hereto, defendants Lawrence, Massey, and Dahms were aware that signs of drug-related impairment in an individual may include, among other things, lethargy, trouble walking, trouble standing up on their own, having to lean against walls, having trouble holding one's head up, having difficulty sitting in a chair without assistance, and having difficulty with motor skills.

110.    Despite their observations of Malick's obvious impairment at JRC, Defendants Lawrence, Massey, and Dahms failed to obtain medical clearance for Malick before leaving him at JRC.

111.    Upon Malick's arrival at JRC, defendant Brozek observed that Malick was lethargic, had trouble walking, had trouble standing up on his own, had to lean against walls, had trouble holding his head up, had to be steadied to avoid falling out of a chair, and had difficulty taking off his coat and sweatshirt.

112.    At all times relevant hereto, defendant Brozek was aware that signs of drug-related impairment in an individual may include, among other things, lethargy, trouble walking, trouble standing up on their own, having to lean against walls, having trouble holding one's head up, having difficulty sitting in a chair without assistance, and having difficulty with motor skills.

113.    At all times relevant hereto, defendant John Doe 1, who was an employee or agent of JRC (hereinafter "John Doe 1"), was aware that signs of drug-related impairment in an individual may include, among other things, lethargy, trouble walking, trouble standing up on their own, having to lean against walls, having trouble holding one's head up, having difficulty sitting in a chair without assistance, and having difficulty with motor skills.

114.    Upon defendants Massey, Lawrence, and Dahms arriving at JRC with Malick, defendant John Doe 1 escorted the aforementioned officers and Malick into JRC and assisted with accepting Malick.

115.    Upon arrival at JRC, defendant Massey told defendants Brozek and John Doe 1 that Malick may be hiding drugs in his underwear.

116.    Defendants Massey and Lawrence reported "checking" Malick, but apparently did not state that they had searched him. As such, defendants Brozek and John Doe 1 were aware that

any check or search of Malick by law enforcement was inadequate to locate the prescription drugs in his possession, as no officer informed defendants Brozek and John Doe 1 that the missing prescription drugs were recovered.

117.   At the time Malick was brought to JRC by defendants Dahms, Massey, and Lawrence, defendant Brozek was aware that he was under the influence of prescription drugs that had not been prescribed to Malick.

118.   Defendant Brozek personally observed that Malick was emotionally distressed upon his arrival at JRC and was coughing and crying.

119.   Acting objectively unreasonably and with deliberate indifference for Malick's serious and obvious medical needs, defendants Brozek and John Doe 1 accepted Malick into custody rather than rejecting him and/or requiring medical clearance before his admission.

120.   Upon information and belief, defendants Brozek, John Doe 1, and the other defendant JRC Staff were trained and had experience to know that a minor suspect or arrestee who had ingested and still possessed prescription drugs that were not prescribed to them could not be relied upon to accurately report their ingestion and possession of the prescription drugs.

121.   In the alternative to the preceding paragraph regarding minor suspects and arrestees in JRC custody and who had ingested and still allegedly possessed prescription drugs, upon information and belief, Dane County had a custom, policy, and/or practice of failing to train its employees to scrutinize minor suspects or arrestees who had ingested and still allegedly possessed prescription drugs that were not prescribed to them.

122.   At approximately 9:44 PM on February 10, 2020, defendants Lawrence, Massey, and Dahms left the holding cell in which they had placed Malick, aware that he was under the

influence of drugs, likely possessed prescription drugs, and that no one from JRC was conducting a search of Malick before locking him into the cell alone.

123.    While in custody at JRC, Malick was threatening self-harm if he was not permitted to go home, and he refused to speak with crisis workers.

124.    Defendants Brozek, John Doe 1, and Ryan M., upon information and belief, Ryan Moorad, a Juvenile Reception Center employee (hereinafter "defendant Moorad"), were aware of Malick threatening self-harm and at the time were aware that no one had recovered the bag of drugs that Malick was thought to possess.

125.    Upon information and belief, defendants Brozek, John Doe 1, Moorad, and John Doe 2, a Juvenile Reception Center employee (hereinafter "John Doe 2) observed Malick engaging in self-harm behaviors such as punching the cinderblock wall of the holding cell and hitting his head against the cinderblock wall.

126.    Defendants Brozek, John Doe 1, Moorad, and John Doe 2 did not intervene to stop or minimize Malick's self-harm behavior of punching the wall and hitting his head against the wall of the holding cell, despite, upon information and belief, their observations of the same.

127.    At approximately 9:55 PM, while defendant Brozek was watching Malick on camera in the holding cell, she observed him remove a pill bottle, a pack of cigarillos, and a small wrench out of his pants.

128.    Despite observing Malick remove the pill bottle, a pack of cigarillos, and a small wrench from his clothing, but not the bag of drugs he was thought to possesses, no JRC defendant made any effort to conduct a search of Malick's person or seek medical clearance.

129.    At approximately 10:11 PM, Malick can be seen with numerous pills in his hand, which, on surveillance video, he can be seen removing from the front of his pants, but not from the pill bottle he previously removed.

130.    No calls to law enforcement, medical personnel, or psychological personnel were made in response to Malick holding a handful of pills that he refused to turn over.

131.    Defendant Moorad spoke with Malick after it was known that he was in possession of multiple pills. He perceived Malick to be at serious risk of self-harm, but he did not take the pills from Malick, nor did he call law enforcement to assist in retrieving the pills from Malick.

132.    At approximately 10:15 PM, defendant John Doe 2 entered the holding cell and retrieved one pill bottle, the small wrench, and the cigarillos, but failed to remove the bag of pills and additional pill bottle from Malick's possession.

133.    At approximately 10:40 PM, Malick stood with pills in his hand, put them in his mouth, and then swallowed them using water from the sink/drinking fountain in his cell.

134.    At approximately 11:00 PM, defendant Schaetz, a Dane County Juvenile Detention employee, arrived for his shift and, upon information and belief, was briefed on the situation with Malick.

135.    Based on his conversation with other JRC defendants, defendant Schaetz was aware that Malick had a close friend recently die by homicide, and defendant Schaetz believed Malick to be suicidal.

136.    Upon information and belief, defendants Brozek, Moorad, John Doe 1, and John Doe 2 were aware that Malick had a close friend recently die by homicide, and said defendants believed Malick to be suicidal.

137.    At approximately 11:05 PM, Malick told defendant Moorad that he either wanted to go home with his mom or kill himself. Malick further threatened to take 4 Xanax to kill himself. After Malick made these threats, Defendant Moorad did not stay with him.

138.    Sometime after approximately 11:05 PM, over an hour after Malick had been brought to JRC, over 30 minutes after Malick was seen holding pills in his hand that had not come from the pill bottle he possessed and then turned over, and over 20 minutes since he took multiple pills at JRC, upon information and belief defendants Brozek, Schaetz, and Moorad observed Malick stand while holding a plastic bag of pills, put numerous pills into his mouth and swallow the pills using the water from the sink/drinking fountain in the cell.

139.    Defendants Brozek, Schaetz, and Moorad finally acted when Malick took multiple prescription pills on this occasion.

140.    After Malick took multiple unidentified pills, defendant Brozek called Madison Police Officer defendant Lawrence, who had left JRC nearly an hour before the call and either spoke with her or left a message for her stating that Malick needed medical clearance.

141.    Upon information and belief, defendant Lawrence was no longer on duty at the time defendant Brozek called her.

142.    Defendant Wege, a Madison Police Sergeant, called JRC and spoke with defendant Schaetz, who told defendant Wege that Malick was in need of evaluation for emergency detention because he was highly suicidal. Defendant Wege informed defendant Schaetz that the referring officers were no longer on duty.

143.     During the call, defendant Schaetz expressed to defendant Wege his belief that Malick was highly suicidal and should be considered for emergency detention because he just had a family member or close friend die by homicide over the weekend and he had ingested pills.

25

144.     Defendants Brozek, Schaetz, and Moorad, acting objectively unreasonably and with deliberate indifference, waited an additional 15-20 minutes before calling 911 for an ambulance, and only after defendant Wege suggested it.

145.     This delay in calling for an ambulance delayed emergency medical care to Malick, thus increasing his impairment and causing him pain, suffering, and emotional distress.

146.     At this point no one had taken the remaining pills away from Malick.

147.     Despite having taken multiple pills since he was brought to JRC, Malick continued to possess pills, which included, among others, extended-release morphine and oxycodone.

148.     Once an ambulance had been called, and with knowledge that Malick was suicidal and still likely in possession of pills, defendant Schaetz told Malick that they were sending him to the hospital to be checked out, and Malick's response was, "I may as well take these 6 percs" at which point Malick put his hand to his mouth and took additional pills, causing further injury, pain, suffering, and emotional distress.

149.     When the ambulance arrived at approximately 11:33 PM, a currently unknown staff member of JRC or Juvenile Detention informed Madison Fire Department paramedics Kevin McDonald and Anthony Hiller that Malick had not been searched yet due to "lack of staff," that Malick had taken a "handful" of pills, and that Malick was displaying increasing drowsiness.

150.     Upon information and belief, Dane County had a policy, procedure, and practice of short staffing, which was a moving force in the failure to search Malick for the drugs he possessed and which led to his injury, pain, suffering, emotional distress, and death.

151.     Paramedics McDonald and Hiller noted that Malick was experiencing fatigue, malaise, and lethargy and reported a primary impression of: "Weakness (Neuro)."

152. Madison Police Officers defendant Marino and defendant Lathrop were dispatched to respond to JRC to assist with the transport of Malick to Meriter Hospital.

153. Defendant Marino was familiar with Madison Police Department's interaction with Malick on February 10, 2020, as she heard the call over the radio.

154. Upon information belief, during this call defendants Marino and Lathrop were made aware of the fact that Malick had secreted drugs on his person and had taken them following his arrest on February 10, 2020, and they received no information to indicate that the drugs had been removed from Malick's person.

155. Neither defendant Marino nor defendant Lathrop attempted to retrieve the pills still in Malick's possession. Malick would later take these same pills, including, among others, extended-release morphine and oxycodone, which caused him pain, suffering, emotional distress and death.

156. When paramedics arrived on scene, Malick exhibited unsteady gait and intermittent slurring of his speech.

157. Malick told paramedics that he had taken Xanax and Percocet.

158. Defendant Wege directed defendant Dahms and City of Madison Police Officer defendant Misener, two of the original arresting officers of Malick to respond to Meriter Hospital to assist and relieve Officers Marino and Lathrop.

159. At no time on February 10 and 11, 2020, did defendants Brozek, John Doe 1, John Doe 2, Schaetz, or Moorad order or provide one-to-one, in-person observation of Malick.

160. At no time did defendants Brozek, John Doe 1, John Doe 2, Schaetz, or Moorad, physically attempt to remove drugs from Malick's person.

161.    At no time did defendants Brozek, John Doe 1, John Doe 2, Schaetz, or Moorad, seek authority, permission, or assistance to remove drugs from Malick's person.

162.    Upon information and belief, defendants Brozek, John Doe 1, John Doe 2, Schaetz, and Moorad were aware that they could turn off the water to the holding cell in which Malick was being held, which would have decreased his chances of successfully taking pills that caused him injury, pain, suffering, emotional distress, and eventually led to his death.

163.    At no time during Malick's time at JRC on February 10 and 11, 2020, did defendants Brozek, John Doe 1, John Doe 2, Schaetz, and Moorad seek permission or attempt to turn off the water to Malick's cell.

164.    In the alternative to the preceding paragraph, and upon information and belief, Dane County failed to train defendants Brozek, John Doe 1, John Doe 2, Schaetz, and Moorad that if a detainee or arrestee was potentially in possession of pills, they were required to turn off the water to the individual's cell.

165.    In further alternative to the paragraph preceding the previous paragraph, upon information and belief, Dane County had a policy, custom, and practice of not requiring employees to turn off the water to JRC and Juvenile Detention cells when there were allegations or suspicions, confirmed or unconfirmed, that a detainee or arrestee was in possession of contraband pills.

166.    Defendants Brozek, John Doe 1, John Doe 2, Schaetz, and Moorad failed to conduct timely and adequate interviews of Malick, Ms. Carter, and Malick's grandmother and legal guardian, Ms. Skaro, regarding, among other things, the types and quantities of medications likely in possession of Malick. *See* Wis. Stat. § 938.067(2).

167.    Defendant Brozek concluded that there was probable cause to believe that Malick committed a delinquent act and continued to present a substantial risk of physical harm to another person.

168.    Defendant Brozek determined that it was necessary to hold Malick in detention until his custody hearing scheduled for 1:30 PM on February 11, 2020 and she created a report to this effect.

### E.    Malick's First Hospitalization

169.    At approximately 11:57 PM on February 10, 2020, Malick was admitted to Meriter Hospital for treatment of overdose after transport by Madison Fire Department EMTs.

170.    This hospital admission, over three hours and twenty minutes after Madison Police responded to Malick's home, was the first time Madison Police defendants or JRC defendants sought, arranged for, or provided medical treatment for Malick, despite the defendants' knowledge that he had experienced a recent traumatic loss, was making suicidal comments, and was under the influence of prescription medications that were not prescribed to him.

171.    While at the hospital with Malick, defendants Dahms, Misener, Marino, and Lathrop were aware that JRC staff had not removed the pills from Malick's person.

172.    Defendants Dahms, Misener, Marino, and Lathrop observed hospital staff remove Malick's clothing, explaining that they were doing so because it was unknown whether he had additional pills on his person.

173.    Defendants Dahms, Misener, Marino, and Lathrop did not see hospital staff search Malick's clothing and did not see hospital staff locate pills on Malick's person.

174.    The pills were still in Malick's clothing.

175.    Defendants Dahms, Misener, Marino, and Lathrop were present when Malick admitted that taking the pills at JRC was a suicide attempt.

176.    Defendants Dahms, Misener, Marino, and Lathrop were present when hospital staff administered the Columbia Suicide Screen, which determined that Malick's Columbia Calculated Risk Level as "High." Defendants Dahms, Misener, Marino, and Lathrop were aware of the results.

177.    No Madison Police defendant, nor JRC/Juvenile Detention defendant gave hospital staff a complete and accurate description of the medications that Malick was thought to have possessed, nor did they take steps to further determine what pills Malick had accessed.

178.    Acting objectively unreasonably and with deliberate indifference, defendants Dahms, Misener, Marino, and Lathrop, who were all aware of Malick's medication-based self-harm, made no effort to remove the additional pills from Malick's clothing either before or after nursing staff had removed Malick's clothing. Said pills included, among other things, extended-release morphine.

179.    Said deliberate indifference resulted in pain, suffering, emotional distress and death to Malick.

180.    Treatment for the overdose included, among other things, liquid charcoal fed through a tube inserted up Malick's nose and down into his stomach, resulting in violent diarrhea and vomiting that lasted for hours, causing Malick pain, suffering, and emotional distress.

181.    At approximately 2:30 AM on February 11, 2020, Meriter hospital discharged Malick for return to JRC. Malick was wearing a diaper because of the ongoing effects of the liquid charcoal.

182.    Defendants Dahms and Misener were provided with Malick's hospital discharge paperwork, which identified the reason for Malick's hospital visit as: "Drug Overdose" and his diagnoses as: "Intentional drug overdose, initial encounter (HCC)" and "Suicidal ideation."

### F.    Malick is Returned to JRC, Neither MPD nor JRC have Recovered the Pills, and Malick Overdoses Again.

183.    Defendant officers Dahms, Misener, and Jane Doe 3 transported Malick back to JRC, placing an extra pad in the back of the transport police car due to Malick's ongoing explosive diarrhea.

184.    Defendant Dahms brought Malick's unsearched clothing and discharge paperwork back to JRC and gave them to defendant Schaetz.

185.    Defendant Schaetz was present when Malick was returned to JRC from the hospital and believed Malick to be "out of his right mind," and noted that he was "staggering and crying incoherently."

186.    Defendants Dahms and Misener told defendant Schaetz that Malick could not be evaluated for Emergency Detention in his current state.

187.    Contrary to Defendant Dahms' and Misener's remarks, defendant Schaetz believed that an Emergency Detention was needed for Malick and defendant Schaetz believed that Malick was still highly suicidal.

188.    Defendant Schaetz did not further pursue Emergency Detention for Malick.

189.    Defendants Dahms, Misener, and/or Jane Doe 3 told defendant Schaetz that Malick was capable of resisting a lot, so he was *probably faking*. Neither of the other two officers present when this remark was made stated, expressed, or corrected the false allegation that Malick was *probably faking*.

190.    Neither defendants Dahms, Misener, nor Jane Doe 3 informed defendant Schaetz that Malick's clothing had not been searched for additional pills, and upon information and belief, none of them stated that it had been searched.

191.    At the time Malick was returned to JRC by Madison Police defendants, his clothing still contained pills, including, but not limited to extended-release morphine.

192.    Transporting officers had to physically hold Malick up to escort him into JRC because he was under the influence and staggering; Malick was also mumbling incoherently.

193.    Understanding that Malick needed monitoring, defendant Schaetz had officers place Malick into a monitoring cell.

194.    Defendant Dahms carried the bag containing Malick's clothing, a pill bottle, and pills, including, at minimum, extended-release morphine and Oxycodone into the same observation cell he and defendants Misener and Jane Doe 3 placed Malick, leaving the bag in the cell after removing the handcuffs and pushing Malick toward the cell's bed.

195.    After defendant Dahms, Misener, and Jane Doe 3 placed Malick in the monitoring cell with the clothing, pill bottle and drugs, they left without identifying themselves to JRC/Juvenile Detention staff.

196.    Upon information and belief, defendant Schaetz observed the bag containing Malick's clothing, pill bottle, and, at minimum, extended-release morphine and Oxycodone pills in the cell after defendant Dahms placed it there, but defendant Schaetz failed to search Malick's property before allowing him to have access to it.

197.    Despite his condition upon return from Meriter Hospital and having no verification that pills had been removed from Malick or his clothing, no JRC defendant ordered or provided one-to-one, in-person observation of Malick at all times.

198.     After his return from the hospital, Malick continued to suffer from side effects of the liquid charcoal including diarrhea and vomiting, and he remained under the influence of the pills.

199.     Malick, having access to additional pills, including, but not limited to extended-release morphine, was kept in the cell for over three hours.

200.     At approximately 6:16 AM on February 11, 2020, Malick, who was obviously impaired at this time, removed a pill bottle from rolled up clothing in his cell.

201.     Approximately 24 minutes later, at about 6:40 AM, Malick, holding pills in his left hand, raised his hand to his mouth, and put the pills into his mouth. He then proceeded to take a drink from the water fountain/sink in his cell, swallowing the pills.

202.     Upon information and belief, defendants Schaetz, Mendoza, Moorad, and Meek, upon information and belief defendant Meek, were aware that they could turn off the water to the cell in which Malick was being held, which would have decreased his chances of successfully taking pills that caused him injury, pain, suffering, emotional distress, and eventually led to his death.

203.     At no time during Malick's time at JRC on February 11, 2020, did defendants Schaetz, Mendoza, Moorad, or Meek seek permission or attempt to turn off the water to Malick's cell.

204.     In the alternative to the preceding paragraph, and upon information and belief, defendant Dane County failed to train defendants Schaetz, Mendoza, Moorad, and Meek that if a detainee or arrestee was potentially in possession of pills, they were required to turn off the water to the individual's cell.

33

205.    In further alternative to the paragraph preceding the previous paragraph, upon information and belief, defendant Dane County had a policy, custom, and practice of not requiring employees to turn off the water to JRC and Juvenile Detention cells when there were allegations or suspicions, confirmed or unconfirmed, that a detainee or arrestee was in possession of contraband pills.

206.    These pills caused Malick pain, suffering, emotional distress, and were a substantial contributing factor in causing his death.

207.    Upon information and belief, no JRC or Juvenile Detention employee was watching Malick in person or on video when, as referenced above, he took numerous prescription pills on the morning of February 11, 2020.

208.    Upon information and belief, Dane County lacked an adequate suicide watch policy and procedure and/or failed to enforce a policy and procedure that would require one-to-one supervision of suicidal detainees and would have required removal of known or suspected means to commit suicide like prescription pills.

209.    Upon further information and belief, Dane County lacked adequate staffing to adequately monitor, evaluate, supervise, and care for Malick.

210.     Shortly after taking these additional pills, Malick spoke to a female JRC employee, defendant Mendoza, and told her that he would take Percocet pills if they did not call his mom [Ms. Carter] to get him.

211.    At approximately 6:51 AM Malick rolled a pill under the cell door, and defendant Mendoza picked it up and walked away from Malick's cell.

212.    Defendant Mendoza did not call for emergency medical or law enforcement response for Malick's overdose or because he still had pills in his cell.

34

213.    Defendant Mendoza did not make efforts to conduct a search of Malick or his cell despite seeing the pill and pill bottle referenced above.

214.    Extended-release morphine and oxycodone pills were still in Malick's cell at this time.

215.    After receiving no assistance from defendant Mendoza, Malick again put numerous pills into his mouth and swallowed them using the drinking fountain/sink in his cell.

216.    These pills caused Malick pain, suffering, emotional distress, and were a substantial contributing factor in causing his death.

217.    Defendant Schaetz left at the end of his shift at 7:00 AM, and he did not make efforts to have a search of Malick or his cell despite being made aware of the pill and pill bottle referenced above and the presence of additional pills in his cell.

218.    911 was not called until Albert Watson came on duty at 7:00 AM; Mr. Watson made the call at approximately 7:04 AM once he observed a charcoal-covered pill bottle in Malick's cell and observed Malick's disoriented and belligerent status.

219.    Only after Mr. Watson called and informed Superintendent Edjron Pearson that he was going to call 911 for Malick did defendant Mendoza tell Mr. Watson that Malick had rolled a pill under his cell door and that she had retrieved it.

220.    Madison Fire Department employees came to the scene to transport Malick back to Meriter Hospital for this latest overdose from ingesting pills.

221.    City of Madison police officers also responded to the scene, including, but not limited to City of Madison Police Department Police Officers defendants Dornan, Stelter, and Lindsey.

222.    Malick informed defendant Dornan that he had taken an "oxy pill and an opiate."

223.    Defendants Dornan, Stelter, and Lindsey heard Malick state that he was going to kill himself and wanted to die.

224.    Mr. Watson entered Malick's cell and began to restrain him so that EMTs could begin treating Malick.

225.    Defendants Dornan, Stelter, and Lindsey followed Mr. Watson into the cell and assisted in restraining Malick.

226.    Defendant Nofodji (aka Marie or Maria), a JRC employee, overheard Malick's suicidal comments and was aware that his previous hospital discharge papers identified the reason for Malick's hospital visit as: "Drug Overdose" and his diagnoses as: "Intentional drug overdose, initial encounter (HCC)" and "Suicidal ideation."

227.    Once restrained, Malick was taken to Meriter Hospital by EMTs at approximately 7:55 AM on February 11, 2020, and was accompanied by Madison Police Officers.

228.    No JRC defendant nor Madison Police Department defendant informed Madison Fire Department EMTs that Malick had possessed and taken extended-release morphine pills.

229.    Upon information and belief, no JRC defendant informed Madison Fire Department EMTs or Meriter Hospital staff that Malick had taken additional pills since he was returned to JRC from Meriter Hospital after his initial discharge at approximately 2:45 AM on February 11, 2020.

230.    No JRC defendant nor Madison Police Department defendant informed Meriter Hospital that Malick had possessed and taken extended-release morphine pills.

231.    Defendant Meek, a Juvenile Detention Center employee, located one or more extended-release morphine pills in the cell after Malick was transported to the hospital on February 11, 2020.

232.     Neither defendant Meek nor any other JCR/Juvenile Detention defendant attempted to or did notify Madison Fire Department EMTs, nor Meriter Hospital, that defendant Meek located one or more extended-release morphine pills in the cell after Malick was transported to the hospital for the second time.

233.     Upon information and belief, in the morning of February 11, 2020, defendant Bauman, the Juvenile Court Administrator in charge of oversight of the JRC, was informed that defendant Meek located a pill in the cell after Malick was transported to Meritier Hospital on February 11, 2020.

234.     Upon information and belief, defendant Bauman did not contact or direct anyone else to contact Madison Fire Department EMTs nor Meriter Hospital staff to inform them that an additional pill had been found in the cell.

235.     Knowledge that extended-release morphine was found in Malick's cell would have likely resulted in a different and more effective course of treatment for Malick than what he received at Meriter Hospital.

236.     Had Malick not taken extended-release morphine while at JRC, he would have endured less pain, suffering, emotional distress, and he would still be alive today.

237.     No JRC defendant wanted to have Malick brought back to JRC from Meriter hospital, yet Malick was scheduled for a custody hearing February 11, 2020, at 1:30 PM.

**G.     Custody is Dropped and Malick Dies of an Overdose that Occurred in Custody.**

238.     At approximately 7:55 AM on February 11, 2020, Meriter Hospital admitted Malick.

239.    Upon information and belief, no Meriter Hospital employee or contractor was made aware that Malick was under the influence of extended-release morphine at the time of his admission.

240.    As a result, no Meriter Hospital employee or contractor treated Malick for ingestion/overdose of extended-release morphine.

241.    The failure of defendants Schaetz, Mendoza, Moorad, Nofodji, Meek, Bauman, Dornan, Stelter, and Lindsey caused Meriter Hospital's inadequate testing and treatment for Malick's February 11, 2020, overdose, which led to unnecessary pain, suffering, emotional distress, and Malick's death.

242.    Meriter Hospital did not conduct an emergency detention assessment of Malick because it was JRC or law enforcement's responsibility to conduct or arrange for assessment of their detainees.

243.    No JRC defendant conducted, arranged, or sought an emergency detention assessment of Malick despite their knowledge of Malick's persistent suicidal remarks, diagnosis of intentional drug overdose and suicidal ideation, possession of dangerous prescription pills, and his escalating use of said pills.

244.    Moreover, Madison Police defendants did not seek out or arrange for an emergency detention assessment for Malick despite their knowledge of Malick's persistent suicidal remarks, diagnoses of intentional overdose and suicidal ideation, possession of dangerous prescription pills, and his escalating use of said pills.

245.    At approximately 8:25 AM on February 11, 2020, defendant Nofodji called Journey Mental Health, commonly referred to as Crisis, and told them that Malick "continues to struggle

w/ his mental health," but failed to indicate that he was suicidal and had been making attempts since he was brought in to JRC on February 10, 2020.

246.    Upon information and belief, a Crisis worker stated that this call was the first contact regarding Malick's crisis and that the agency in which custody Malick was, had to make a request for emergency detention assessment.

247.    Upon information and belief, defendant Nofodji did not tell the Crisis worker that Malick was going to be brought back to JRC after his hospitalization.

248.    After Malick was admitted to Meriter Hospital on February 11, 2020, Ms. Carter received a call from a female JRC employee, upon information and belief, defendant Nofodji.

249.    During this call, defendant Nofodji informed Ms. Carter of Malick's hospitalization and told her that he was given a shot of Ketamine. Defendant Nofodji did not tell Ms. Carter that Malick remained unsearched and in possession of prescription pills following his February 10, 2020 overdose and had ingested additional pills on February 11, 2020.

250.    During this same call, Ms. Carter asked whether she could go to the hospital to visit Malick and defendant Nofodji told her that she was not allowed to visit him because he was still in custody.

251.    Upon information and belief, at some point after 8:00 AM on February 11, 2020, defendants Bauman, Juvenile Court Administrator, Pearson, Juvenile Detention Superintendent, and other JRC and Juvenile Corrections defendants, including, but not limited to defendant Nofodji all concluded that they did not want Malick in their care and custody because of the challenges of dealing with him, short staffing, and due to his highly impaired status.

252.    The same defendants identified in the paragraph above devised a plan to release Malick to his mother even though all were aware that Meriter Hospital staff had not been provided

sufficient information, which was in the defendants' possession, such as Malick's repeated suicidal threats, his taking two rounds of numerous pills on the morning of February 11, 2020, and the existence of additional pills in his cell after transport, which included extended-release morphine.

253.    Defendant Nofodji falsely led defendant Dornan and Meriter Hospital Staff to believe that Crisis had approved JRC dropping custody of Malick, when in fact Crisis would not approve dropping custody of Malick without first evaluating him.

254.    Upon information and belief, when defendant Dornan questioned the plan and stated he needed to talk to a supervisor, defendant Nofodji told defendant Dronan that Malick could either be released from Meriter Hospital to his mother or he could be returned to JRC, at which point he would be released to his mother.

255.    Defendant Dornan discussed dropping custody with officer in charge (OIC) Jugovich and defendant Dornan reported that if JRC was dropping custody, Madison Police would do the same.

256.    Meriter Hospital staff was notified that JRC would be dropping custody of Malick and he was able to go home once his mother arrived.

257.    At the time JRC dropped custody of Malick, he had extended-release morphine in his system.

258.    No JRC or Madison Police Department employee had informed Meriter staff of Malick's ingestion of extended-release morphine, and as such, it remained untreated.

259.    Malick was so impaired at the time of his discharge, he needed to leave the hospital in a wheelchair with his mother at approximately 2:09 PM on February 11, 2020.

260.    On the way home Malick again defecated on himself.

261.    Upon arriving home with Malick, who was still heavily impaired, agitated, fearful, suffering, and emotionally distressed, Ms. Carter had to assist Malick into the bathroom and she placed a stool in the shower for him. Malick was covered in his own feces, urine, and the activated charcoal.

262.    Thereafter, Ms. Carter assisted Malick to bed, kissed him, and told him that she loved him – Malick told her that he loved her too. Paula would never see Malick alive again.

263.    Shortly before 1:53 AM on February 12, 2020, Ms. Carter went to check on her son Malick and found him deceased.

264.    At the time Ms. Carter found Malick found dead, he was in rigor mortis and his body was stiff. Malick had died of a drug overdose hours before he was found. That drug overdose occurred in JRC.

## V.    STATEMENT OF CLAIMS

### Constitutional Claims

265.    The City of Madison and Dane County took Malick Abdoul Sillah into legal and physical custody as an arrestee and/or pretrial detainee, thereby establishing a special custodial and supervisory relationship toward him, giving rise to legal duties to secure Mr. Sillah's liberty interests and rights, including his physical safety, essential care and treatment, his right to be free from unnecessary pain and suffering, and his life – substantive rights which are protected by the Fourth and Fourteenth Amendments to the U.S. Constitution. The conduct of each Defendant, as detailed above, caused Mr. Sillah to suffer unnecessary physical and emotional pain, injury, and death in violation of his Fourth and Fourteenth Amendment rights.

266.    Defendants' objectively unreasonable, arbitrary, and deliberate actions and inaction and reckless disregard of their respective constitutional duties, as detailed above, caused the Plaintiff to suffer physical and emotional injury and death.

267.    Dane County and the City of Madison authorized, tolerated, ratified, permitted, or acquiesced in policies, practices, and customs, oral and written, pronounced and de facto, that were the moving force of the deprivation of plaintiffs' constitutional rights detailed above.

268.    Dane County and the City of Madison are liable, pursuant to Wis. Stats. § 895.46(1)(a), to indemnify all judgments, including compensatory and punitive damages, attorney's fees, and costs, awarded against their respective officials, employees, and agents named as defendants herein, all of whom were acting within the course and scope of their respective employment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands a jury trial and prays that this Court:

1.    Enter judgment for plaintiff against each defendant, jointly and severally, awarding compensatory and hedonic damages.

2.    Enter judgment for plaintiff against defendants John Bauman, Edjron Pearson, Thomas Dahms, Haley Massey, Sarah Lawrence, Javier Loredo, Kurt Wege, Brittney Lathrop, Catherine Marino, Elijah Misener, Christopher Dornan, Joel Stelter, Rebecca Lindsey, Amber Brozek, Norbert Schaetz, Akouvi Nofodji, Ryan Moorad, Melisa Mendoza, Jeff Meek, John Doe 1, John Doe 2, and Jane Doe 3 awarding punitive damages.

3.    Award pre-judgment and post-judgment interest, together with costs, disbursements, and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

4.    Award such other relief as may be just and equitable.

5.  Award such other remedies as may be available under the law.

Dated at Milwaukee, Wisconsin this 8th day of February, 2023.

FIRST, ALBRECHT & BLONDIS, S.C.
Attorneys for the Plaintiff

s/ Thomas C. Lenz

_____

Thomas C. Lenz
State Bar. No. 1055135
James P. End
State Bar No. 1032307
Christopher G. Meadows
State Bar No. 1055144
Bryn I. Baker
State Bar No. 1102534

**P.O. ADDRESS:**
Broadway Theatre Center
158 North Broadway, Suite 600
Milwaukee, WI 53202
Telephone: (414) 271-1972
Facsimile: (414) 271-1511
tlenz@fabattorneys.com
jend@fabattorneys.com
cmeadows@fabattorneys.com
bbaker@fabattorneys.com