IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ESTATE OF ABDOUL "MALICK" SILLAH by its Special Administrator, Paula Carter,

Plaintiff,

STATE OF WISCONSIN DEPARTMENT OF HEALTH AND FAMILY SERVICES,

Involuntary Plaintiff,

v.

CITY OF MADISON, a body politic,
DANE COUNTY, a body politic,
JOHN BAUMAN, individually, and in his official capacity as Dane County Juvenile Court Administrator,
EDJRON PEARSON, individually, and in his official capacity as Dane County Juvenile Detention Superintendent,
THOMAS DAHMS, individually,
HALEY MASSEY, individually,
SARAH LAWRENCE, individually,
JAVIER LOREDO, individually,
KURT WEGE, individually,
BRITTNEY LATHROP, individually,
CATHERINE MARINO, individually,
ELIJAH MISENER, individually,
CHRISTOPHER DORNAN, individually,
JOEL STELTER, individually,
REBECCA LINDSEY, individually,
AMBER BROZEK, individually,
NORBERT SCHAETZ, individually,
MARIE NOFODJI, individually,
RYAN MOORAD, individually,
MELISA MENDOZA, individually,
JEFF MEEK, individually, and
AARON BARATZ, individually,

Defendants.

OPINION and ORDER

23-cv-96-jdp

---

This case arises from the suicide of 16-year-old Abdoul Malick Sillah following his arrest and detention at the Dane County Juvenile Detention Center. Sillah had been arrested at the request of his mother, Paula Carter, on the evening of February 10, 2020, because he was intoxicated and threatening his family. In the 18 hours that Sillah was away from home, he took pills at the Detention Center, was taken to Meriter Hospital for treatment for an intentional overdose, returned to the Detention Center, was again observed with pills in his cell, and was taken to Meriter for treatment for a second potential overdose. Sillah, apparently recovering, was released from Meriter to Carter's custody on the afternoon of February 11. About 12 hours later, Carter found Sillah dead in his bed. Sillah had taken numerous drugs, but it was an overdose of morphine that killed him. When Sillah took the fatal dose of morphine is genuinely disputed.

Carter, in her capacity as administrator of Sillah's estate, brings claims against the Madison police officers who arrested Sillah, Dane County employees at the Detention Center, and the police officers who transported Sillah to and from Meriter, as well as claims against the City of Madison and Dane County.[1] Carter contends that defendants failed to protect Sillah from the risk of self-harm by failing to thoroughly search Sillah for pills that he had hidden in his underwear and by failing to treat his serious medical needs once they knew he was at risk of suicide.

[1] The estate's complaint names the State of Wisconsin Department of Health and Family Services as an "involuntary plaintiff." But "there is nothing in the Federal Rules of Civil Procedure that permits a plaintiff unilaterally to force another party to join his lawsuit as an involuntary plaintiff." *Doermer v. Oxford Fin. Grp., Ltd.*, 884 F.3d 643, 646 (7th Cir. 2018). The state has not appeared or participated in this case, so the court will dismiss it as a party.

Defendants move for summary judgment. The individual defendants contend that they acted reasonably while Sillah was in their custody and that the estate cannot prove that their actions caused Sillah's death. They also assert qualified immunity, on the ground that their conduct did not violate any of Sillah's clearly established constitutional rights. The city and the county contend that the estate has not shown that Sillah's death cannot be attributed to any city or county policy.

Protecting a detained person from self-harm is a difficult task. Some of the defendants here were not models of diligence, but none of them turned a blind eye to obvious threats to Sillah's wellbeing. For reasons explained in this opinion, with one exception, the court will grant summary judgment to defendants. The estate has not adduced evidence that the individual defendants acted unreasonably in the face of a known or obvious risk to Sillah, or that defendants' conduct was the proximate cause of Sillah's death. The estate has not shown that Sillah's death was attributable to any city or county policy.

The exception is the claim against defendant Javier Loredo, based on the allegation that he punched Sillah during the initial arrest. Loredo denies the allegation, but whether he punched Sillah is genuinely disputed, so this claim cannot be resolved on summary judgment.

## UNDISPUTED FACTS

The court begins with an overview of the events that led to Abdoul Malick Sillah's death. The court will provide additional details about the knowledge and conduct of each defendant in the analysis section. The facts in the overview are undisputed except where noted.

**A. Sillah's arrest**

Sillah was distressed on the evening of February 10, 2020. A close friend had been killed two days before. Earlier in the day, he had taken Xanax to help with the grief. Around 8:30 pm, his mother Paula Carter called 911 to report that Sillah was trashing the house, accusing family members of stealing pills from him, and threatening to harm them. Carter described Sillah as "high out of his mind." Dkt. 120-1, at 2. She reported that Sillah had left the house and was running across the street.

Two officers from the Madison Police Department, defendants Haley Massey and Sarah Lawrence, responded to Carter's 911 call. Massey found Sillah nearby. Massey frisked Sillah for weapons and found none. Sillah informed Massey about his friend's death and said that he was having a hard time with the loss. Sillah also told Massey that he was not on drugs. He later said the same thing to Lawrence. Carter informed Massey that Sillah had stolen a bottle of Vyvanse, an ADHD medication, from her safe. Carter also informed Massey that Sillah had been seen with a bag of pills earlier and that if he had pills hidden on him they would likely be hidden near his groin. (The parties dispute whether Carter also told the officers that Sillah had stolen drugs from his grandmother's safe earlier in the day, but for purposes of summary judgment, the court will assume that she had.)

Carter requested that the officers remove Sillah from her house. Massey decided there was probable cause to arrest him for disorderly conduct. By that point Sillah had become agitated and told Lawrence that he would resist arrest and that they would need a gun or taser to take him into custody. So Massey called for backup to help take Sillah into custody. Defendants officer Thomas Dahms and sergeant Javier Loredo were dispatched to help with the arrest. Once Dahms arrived, he went with Massey and Lawrence into the house to arrest

Sillah. Sillah resisted being handcuffed and the officers forced him onto a couch with them on top of him to gain compliance so they could get the handcuffs on him. When Loredo arrived, Sillah was handcuffed, wearing a spit hood, and physically resisting being walked down to Massey's squad car. Lawrence attempted to search Sillah before they put him in the car, but he continued resisting, especially when she attempted to search near his groin. Lawrence was not able to complete a search.

The estate contends that, as Sillah continued to resist, Loredo punched him in the face immediately before the officers placed him in the car. Loredo denies that he punched Sillah.

Sillah was placed in Massey's car. Massey, Lawrence, and Dahms separately drove to Dane County's Juvenile Detention Center. Loredo did not participate in the transport, and he had no further interactions with Sillah.

The Juvenile Detention Center has a Reception Center (JRC) staffed by juvenile court counselors who conduct the intake of youths. JRC has a holding cell where youth are held during the intake process. Typically, once JRC staff complete the intake, the youth is admitted to "Detention," a separate part of the Juvenile Detention Center with its own staff and policies. The court will use the terms JRC and Detention when discussing those areas and the term Center to refer to the facility as a whole.

Massey called JRC to inform the staff that they were coming. Defendant Amber Brozek was on duty at JRC. Brozek called Lawrence asked whether Sillah needed to be taken for medical clearance. The officers did not take Sillah for medical clearance before they arrived at JRC.

**B. Sillah's first transfer to JRC custody**

Sillah was no longer resisting when he arrived at JRC at about 9:30 pm. JRC video shows Sillah swaying slightly when standing, having trouble keeping his head up straight, and struggling to remove his sweatshirt without help from the officers. Dkt. 156 (video titled "4-0-2020-02-10 21-41-03-128" and "15-0-2020-02-10 21-38-07-131").

Once the officers put Sillah in the holding cell, they met briefly with Brozek, providing her with details about Sillah's arrest, including that Carter believed Sillah could be hiding pills in his boxers. The officers left JRC. Massey and Lawrence had no further interactions with Sillah.

The staff working at the Center when Sillah arrived on the night of February 10 included Brozek, defendant Aaron Baratz, working as the receptionist at JRC, and defendant Ryan Moorad, working in Detention. Brozek, Baratz, and Moorad all had access to live video of Sillah in the holding cell. After the officers left, Brozek stopped by the holding cell to check on Sillah and then called Carter, who provided information about the types of medication that Sillah had taken from his grandmother's safe.

Video recordings from some point after the officers left Sillah in the holding cell show Sillah take out a pill bottle from his underwear. The bottle remained in clear view of the camera for approximately 18 minutes. Over those 18 minutes, Sillah can be seen holding other items that he had hidden in his underwear, a small metal wrench and a pack of cigarillos. Approximately 16 minutes after Sillah removed the pill bottle from his underwear, Sillah was looking at something in his hand that he removed from his underwear, which the estate asserts were pills. A few seconds later, he stood up and began pacing. He hit his head against one wall and then punched the opposite wall. Approximately 18 minutes after the pill bottle was first

visible, Sillah picks it up and displayed the pill bottle and the pack of cigarillos in front of the camera.

At that point, Baratz noticed that Sillah had something in the cell with him. Baratz went into the cell and took the items from Sillah. Sillah denied having any other items on him. Baratz gave Brozek the things he had taken from Sillah. Brozek called the officers who had brought Sillah to JRC to ask them to come back and take him to be medically cleared. The exact timing is disputed, but the parties agree that Baratz entered Sillah's cell some time before 10:30 pm because at that point Baratz shift ended and he left JRC.

Later surveillance video shows Sillah appearing to swallow pills. The parties dispute the precise timing and whether anyone at the Center saw Sillah take the pills.

At approximately 11:05 pm, Moorad went to the holding cell to talk to Sillah to convince him to go through intake. Moorad was familiar with Sillah from a previous stay in Detention. Sillah said that he either wanted to go home or kill himself and that he had Xanax with him. Moorad then saw that Sillah had pills in the cell with him. Sillah threatened to take the pills to kill himself, and when Moorad unlocked the door to the cell Sillah swallowed them. Moorad immediately reported this to Brozek and defendant Bert Schaetz, whose shift in JRC had just started.

Brozek called the police to request that officers immediately come to take Sillah for medical treatment. Schaetz eventually spoke to defendant sergeant Kurt Wege, who told him to call 911. Paramedics arrived at JRC shortly after 11:30 pm, and defendant officers Catherine Marino and Brittney Lathrop arrived shortly after. Marino and Lathrop accompanied the paramedics who took Sillah to Meriter Hospital, arriving at approximately 11:55 pm.

**C. First visit to Meriter**

Defendant officers Elijah Misener and Dahms arrived at the hospital shortly after Sillah got there. Sillah was again combative, resisting and verbally threatening hospital staff. The officers handcuffed Sillah to his hospital bed and assisted in restraining him as the emergency department staff treated him. The emergency department providers treated Sillah for a potential overdose on unknown drugs. At about 12:15 am, they inserted a tube through Sillah's nose into his stomach to suction out the pill fragments. They then administered liquid activated charcoal through the tube into Sillah's stomach to neutralize any of the pills that remained. Sillah suffered severe diarrhea and vomiting from the charcoal treatment, and he was dressed in a diaper and paper hospital scrubs. Shortly after, Marino and Lathrop left the hospital and had no further interactions with Sillah.

Hospital staff had removed Sillah's clothing before the treatment. The hospital staff placed Sillah's clothing in a bag that was given to the officers who accompanied Sillah. None of the officers searched Sillah's clothing.

Dahms and Misener remained with Sillah at the hospital for a period of observation. Sillah was not given a drug test or an evaluation for a potential emergency mental health detention, but hospital staff documented that his overdose was considered an attempted suicide and that Sillah was considered suicidal. At 2:39 am, Meriter discharged Sillah, and officers Dahms and Misener took him back to the Center, with Sillah riding in Dahms's car.

**D. Transfer back to county custody**

Dahms, Misener, and Sillah arrived back at the Center at approximately 2:45 am on February 11. At that point, Schaetz was the staff member working in JRC and defendant Melisa Mendoza was the staff member working in Detention. Dahms and Misener escorted Sillah into

Detention cell R2, which was used for youth on suicide watch. None of the defendants searched Sillah before they left him in R2, still wearing the diaper and paper hospital scrubs.

Video showed Dahms carrying a bag with Sillah's clothes into Detention. The evidence does not show where Dahms left the bag, or whether Sillah had access to it at any point between when hospital staff removed his clothes and when the officers left him in R2. After Dahms and Misener escorted Sillah into his cell, they left Detention and had no further interactions with Sillah.

The parties dispute whether Sillah was formally placed on suicide watch, but they agree that R2 had two doors with window that could be used to check on him, and that R2 had video and audio surveillance.

Both Schaetz and Mendoza knew that Sillah had attempted suicide. They also both had the ability to monitor the live surveillance footage of Sillah's cell. Mendoza was stationed at a desk outside R2, and she testified that she checked on Sillah, "[a] lot" and that she would check on him through the window when she did her rounds every 25 minutes to check on the other children in detention. Dkt. 112 (Mendoza Dep. 56:8–21, 82:2–9). But Mendoza did not document those checks.

Sillah slept for several hours and awoke around 6:00 am and began to move around his cell. The Center's staff was in the midst of changing from night shift to day shift. Schaetz and Mendoza were still on duty, their shifts would end at 7:00 am. Defendant Jeff Meek arrived for the start of his shift at 6:00 am. Defendant Marie Nofodji and Albert Watson (not a defendant) both started their shifts at 7:00 am.

Surveillance video shows when Sillah woke up, he appeared to be stumbling as he moved around his cell. Sillah can be seen removing a pill bottle from the paper hospital pants that he

had been wearing. Later, Sillah can be seen holding what appear to be pills that he takes out of the bottle. Schaetz provided Sillah with regular pants between 6:30 am and 6:45 am, and those pants can be seen on the video of Sillah in the cell with the pill bottle. Video from outside R2 shows that Mendoza picked up a pill that had rolled out from the cell. Mendoza testified that this likely occurred around 6:40 am, but she could not recall exactly when she found the pill. Dkt. 112 (Mendoza Dep. 83: 16–21, 94:13–25, 95:5–16). Watson's testimony suggests that it might have been after 6:50 am. Dkt. 88 (Watson Dep. 71:15–21, 80:11–16).

When Watson began his shift at 7:00 am, he could hear Sillah crying and yelling. Watson went to the window of R2 and saw the pill bottle. Watson called the superintendent of the Center, Edjron Pearson, to inform him about what was happening with Sillah. Watson called 911 at 7:05 am. Paramedics arrived shortly after. By that time, Sillah had told Watson that he would not cooperate with leaving the cell. Defendants officers Christopher Dornan, Joel Stelter, and Rebecca Lindsey also responded to the 911 call. Those officers and Watson entered the cell to bring Sillah out. Because Sillah was resisting, the paramedics got clearance from the emergency department doctor to give him ketamine. The officers and paramedics carried Sillah out of the cell and strapped him to a gurney that the paramedics then use to take Sillah out of the Center.

Schaetz and Mendoza had left at the end of their shifts by the time paramedics arrived. Nofodji arrived after the paramedics. After the officers and paramedics had left with Sillah, Meek searched R2 and found two pills. The pill that Mendoza picked up after it rolled outside of the cell was identified later that day as oxycodone. The other pill that Meeks found in R2 was not identified until after Sillah's death, when an investigator determined that it was morphine.

**E. Second visit to Meriter**

Sillah arrived at Meriter for the second time at approximately 8:00 am on February 11. Emergency department doctors were aware of his previous suicide attempt and monitored his condition. Still under the effect of the ketamine, Sillah was not communicating with the medical providers, but they treated him for possible intentional overdose by monitoring his vital signs.

While Sillah was being treated at Meriter, Nofodji and her supervisor at the Center, defendant John Bauman, considered what they would do with Sillah. Nofodji was communicating with Journey Mental Health, the organization that the county defendants worked with to have youth evaluated for mental health crises and potential emergency detentions. Nofodji was also communicating with Meriter, Carter, and officer Dornan, who had custody of Sillah during his second visit to Meriter.

At approximately 12:00 pm, staff at Meriter were informed that the Center would not continue custody of Sillah. Carter arrived at Meriter at some time between 12:00 and 12:30 pm. Officers Dornan and Stelter left the hospital shortly after Carter arrived. At 2:39 pm, Sillah was discharged from Meriter to Carter's custody. Sillah's treating doctor testified that he had been treated for a potential life-threatening ingestion of unknown pills. Dkt. 86 (Viet Dep. 71:1–2). But none of the parties proposed specific details about the treatment Sillah received during his second visit to Meriter.

**F. Sillah's return home and death**

Carter drove Sillah home from Meriter after his discharge. Carter asserts that Sillah needed assistance climbing the stairs and getting into the shower once he got home. Carter

confirmed that Sillah was in his bed around 3:00 pm and left him to sleep. Carter did not check on him again until approximately 1:50 am, when she found him dead in his bed.

An autopsy by the Dane County Medical Examiner found that the cause of Sillah's death was "acute intoxication due to the combined effects of morphine, oxycodone, alprazolam, sertraline, ketamine, and amphetamine, with ensuing sedation, loss of consciousness, respiratory sedation, apnea coma, anoxic brain injury, cardiac arrhythmia, and ultimately death." Dkt. 120-10, at 12. The medical examiner certified that the manner of his death was a suicide.

## ANALYSIS

The estate asserts the following claims under the Fourth Amendment: (1) Loredo used excessive force by punching Sillah; (2) each of the individual defendants failed to protect Sillah from self-harm by not searching him to remove the pills he had in his possession; (3) each of the individual defendants failed to provide adequate medical care for Sillah by not sharing relevant information about Sillah with medical providers or not ensuring that he received proper medical assessment; and (4) the city and county have unconstitutional policies that caused Sillah's death.

Defendants move for summary judgment on each of those claims. Summary judgment is appropriate only if there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party, here the estate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is genuinely disputed only if both sides have evidence that would support a reasonable jury finding. In other words, to forestall summary judgment,

the estate must adduce evidence that, with the record taken as a whole, could support a reasonable jury verdict in its favor. *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

The court begins with minor a preliminary matter. After summary judgment briefing, the estate moved to withdraw its supplemental proposed fact No. 49, in both Dkt. 171 and 175. Dkt. 187. The fact relates to Sillah's grandmother's purported lack of knowledge that Sillah had stolen pills from her in the past. The city defendants disputed the fact with good evidentiary support, yet they oppose the motion to withdraw. Presumably, the city defendants think that the estate should somehow be stuck with some dishonest testimony. That's not a good reason to allow a party to retract a proposed fact. The court will grant the motion and allow the estate to withdraw that proposed fact, which isn't material to the court's decision anyway. On to the merits.

The court will begin with the defendants causation argument, which is that the estate cannot prove that any defendant's action caused harm to Sillah. This requires the court to decide defendants' motion to exclude some of the opinions of the estate's pharmacology expert. The court will then turn to the claims against the individual defendants. The court will conclude with the estate's municipal liability claims against the city and county.

**A. The estate's general theory of causation**

All of the experts in this case concede that they cannot definitively say whether Sillah ingested a fatal dose of morphine while he was at the Center or some time after he left defendants' custody. The sides offer competing theories of the timing of the overdose, but defendants contend, in essence, that the estate's theory is not supported by admissible evidence. Dkt. 122, at 27–29; Dkt. 126, at 19–20.

Part of defendants' argument is that the opinions of the estate's pharmacology expert Steven Oakes are inadmissible.

**1. Motion to exclude opinions and testimony from Steven Oakes**

The estate has disclosed a pharmacology expert, Dr. Steven Oakes, who offers the opinion that defendants caused Sillah's death by failing to take the pills away him or to have him evaluated by medical professionals. Oakes has a Ph.D. in pharmacology and defendants do not challenge Oakes's qualifications to provide opinions on Sillah's toxicology report. But defendants contend that his opinions about defendants' conduct are not based on his pharmacology expertise, and those opinions should be excluded. Specifically, defendants contend that (1) he is not qualified to provide opinions about police policies and whether Sillah should have been searched or drug tested while he was in defendants' custody and (2) his opinions about when Sillah took the drugs is based on speculation about Sillah's reported behavior rather than on his knowledge of pharmacology.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993) and *Kumho Tire Company, Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999), the court must ensure that proffered expert testimony meets the requirements of Rule 702. For testimony to be admissible under Rule 702, the expert's opinions must be based on reliable methods, and those methods must be reliably applied to the facts of the case.

The court agrees that Oakes's opinions about what defendants should have done to protect Sillah are not admissible. The conclusion of Oakes's report is that Sillah's death "could have been prevented" if they had conducted a "complete search," properly communicated with the medical providers at Meriter, or required Sillah submit to a blood or urine test to determine what type of drugs he had taken. Dkt. 108, at 14–15. But Oakes does not rely on his expertise

as a pharmacologist in reaching these opinions, and the estate concedes that he has no specialized knowledge or expertise about law enforcement or juvenile detention on which to base these conclusions. Oakes's opinions and testimony about Sillah's behavior and whether Sillah could have obtained more drugs after being released to go home with his mother is likewise inadmissible.

Not all of Oakes's opinions are outside the scope of his expertise. Oakes's report includes a section about the characteristics of the drugs that were in Sillah's body, whether there were sufficient quantities of the drugs to cause his death, and what is known about how long those drugs would have been in his system to reach a lethal level. Oakes opines that Sillah had a lethal level of morphine in his blood. And, most important here, he cites studies showing that it can take between three and 15 hours after ingestion for morphine to reach peak concentration in the blood. These opinions are squarely within his specialized expertise as a pharmacologist.

Defendants contend that Oakes's opinions about the timing of Sillah's fatal overdose is not based on a reliable scientific methodology because Oakes acknowledged that there is no way precisely determine when Sillah took the morphine on the amount in his body at the autopsy. But Oakes also testified that his opinion that the morphine in Sillah's blood was based on the timing of action of the drugs, which is in turn based on peer reviewed studies. Defendants' own expert criticizes Oakes's analysis, but defendants' motion does not challenge Oakes's reliance on those studies. Oakes's opinions do not have to be unimpeachable to be admissible.

Defendants also contend that Oakes's opinions about whether Sillah could have ingested the morphine in custody is merely speculative because Oakes admitted that he did

not know the number and type of pills that Sillah took, and that it was possible that Sillah could have taken the morphine once he returned home. The court concludes that Oakes's opinion provides admissible evidence of a range of time prior to death in which Sillah might have ingested the fatal dose of morphine.

In sum, the court will exclude opinions and testimony from Oakes about what defendants should have been done to prevent Sillah's death, and any opinions and testimony about Sillah's behavior or access to drugs. The court will not exclude Oakes's opinions about the characteristics of the drugs found in Sillah's toxicology report or his opinions about the range of time when Sillah might have ingested the fatal dose of morphine.

**2. Whether the estate can show that Sillah took the fatal dose of morphine while in defendants' custody**

Defendants rely on the medical examiner's assessment of the time of death as between 11:00 pm and 12:00 am. Defendant's pharmacology expert estimates that the fatal dose of morphine was taken three to four hours before death, which means that, in defendants' view, Sillah took the morphine somewhere between 7:00 pm and 9:00 pm. If defendants' experts are correct, then Sillah took the fatal dose of morphine while he was at home, not while in defendants' custody. Given that he could have gotten more pills once he left Meriter, no reasonable jury could find for plaintiffs if he took the fatal overdose more than four hours after he was discharged from Meriter.

According to the estate's experts, the fatal overdose could have happened much earlier. Plaintiff's medical expert puts the time of death at 6:00 pm to 8:00 pm. As, discussed above, Oakes says that the ingestion of the morphine—which was probably in the extended release form used by his grandmother—was between three and 15 hours before death, Dkt. 108, at 14,

putting the ingestion of the fatal dose as early as 3:00 am, shortly after Sillah had returned to the Center from his first trip to Meriter. So, according to the estate's theory, Sillah could have taken extended release morphine during his second stay at the Center, and died from the overdoes hours later at home.

One objection to that theory is that its speculative: Oakes acknowledges that the morphine might have been taken as little as three hours before death, which, on the defense theory, is about the time Sillah got home. But the morphine pill found in cell R2 is enough to corroborate the estate's theory so that it rises above the level of mere speculation.

Defendants' pharmacology expert, Susan Skolly-Danziger, says that that it is unlikely that Sillah ingested a fatal dose of morphine while in defendants' custody, because of his clinical improvement during his second visit to Meriter. Dkt. 103, at 31. Presumably, that's why the providers at Meriter released him to go home with Carter. Skolly-Danziger also criticizes Oakes's conclusions about morphine's duration of action, because the studies showing a 15-hour delay involved patient populations with specific conditions, such as renal failure, that are inapplicable to Sillah. Dkt. 103, at 27. These might be good arguments for the jury. But the court's task here is not to weigh the evidence, but to decide if there is a genuine dispute of material fact.

The estate has offered evidence from which a reasonable jury could conclude that Sillah took morphine while in the county defendants' custody. The court will deny the defendants' motions for summary judgment based on the theory that Sillah did not take the fatal dose of morphine until he left their custody.

**B. Claims against individual defendants**

The estate claims that the individual defendants violated Sillah's constitutional rights by using excessive force, failing to protect Sillah from self-harm, and failing to provide adequate medical care. Dkt. 68, at 41–42 (Second Amended Complaint, "Statement of Claims").

Sillah was in custody as an arrestee, not a convicted person, so the estate's claims are governed by the Fourth Amendment. *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). As a general matter, state actors are not constitutionally required to protect individuals from harming themselves, but, when a person is in custody, the custodial relationship creates a "duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). The Seventh Circuit analyzes claims concerning the conditions of pretrial confinement—whether characterized as arising under the Fourth or Fourteenth Amendment—under an objective reasonableness standard. *Jump v. Village of Shorewood*, 42 F.4th 782, 793 (7th Cir. 2022).[2]

The Seventh Circuit recently clarified the two elements of the objective reasonableness standard. *Pittman by & through Hamilton v. Madison County, Illinois*, 108 F.4th 561, 564 (7th Cir. 2024). A plaintiff bringing constitutional claims about his treatment in pretrial detention must establish two elements: (1) the defendant engaged in intentional conduct or made an intentional decision about the conditions of the plaintiff's confinement, and (2) the

---

[2] The county defendants contend that the estate's claims should be analyzed under a heightened "deliberate indifference standard" that requires showing the defendants were subjectively aware of serious risk of harm and consciously disregarded that risk. Dkt. 126, at 6–7. But the county defendants rely on cases involving claims brought under the Eighth Amendment, which applies once a person has been convicted. The standard they cite does not apply to the estate's claims in this case. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 351 (7th Cir. 2018).

defendant's conduct or decision was objectively unreasonable under the circumstances. *Id.* In the context of excessive force claims, the first element is satisfied if the defendant's action was intentional as opposed to an accident or mistake. To illustrate, an officer who shoves someone to knock them down would satisfy the first element of the test, but an officer who trips and accidentally knocks over a detainee would not satisfy the first element. *Id.* at 570.

In the context of conditions of confinement or denial of medical care, the first element "requires proof only that a defendant made an intentional decision about the plaintiff's conditions." *Id.* at 571. Again, this element would not be satisfied if the defendant's actions are inadvertent or accidental. But a plaintiff is not required to prove that the defendant was subjectively aware of the risk of harm from the defendant's intentional decision. *Id.* If a plaintiff proves that a defendant acted intentionally, then the analysis moves on to whether a reasonable officer under the circumstances would have engaged in that conduct or made that decision. Here, most of defendants' challenged conduct involves intentional conduct as that element is defined under *Pittman*.

Defendants move for summary judgment on the claims against the individual defendants on the grounds that (1) each defendants' conduct was reasonable or (2) they are entitled to qualified immunity because they did not violate a clearly established constitutional right.

Under the doctrine of qualified immunity, a plaintiff may not obtain damages from a defendant for a constitutional violation unless the plaintiff shows not only that the defendant violated his rights, but also that his rights were clearly established at the relevant time. The plaintiff can meet this burden by pointing to either: (1) a closely analogous, binding case that was decided in his favor; (2) a more general constitutional rule that applies "with obvious

clarity" to the defendant's conduct. *Cibulka v. City of Madison*, 992 F.3d 633, 639–40 (7th Cir. 2021). In deciding whether the defendants are entitled to qualified immunity on a motion for summary judgment, the court must view the evidence in the light most favorable to the plaintiff and ask whether a reasonable jury could find that the defendants violated the plaintiff's clearly established rights. *Jerger v. Blaize*, 41 F.4th 910, 913 (7th Cir. 2022); *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017).

The reasonableness of each defendants' conduct and the specific constitutional right at issue depends on the situation and the information available to that individual defendant. But the claims here fall into five groups, following Sillah's changes in location: (1) initial arrest by city defendant officers Massey, Lawrence, Dahms, and Loredo; (2) transfer to the Juvenile Resource Center and Sillah's first period in custody there; (3) first visit to Meriter; (4) transport back to the Center and Sillah's second period in custody there; and (5) the second visit to Meriter.

**1. Sillah's initial arrest**

**a. Excessive force claim against Loredo**

The estate amended its complaint to add an excessive force claim against Loredo, based on its allegation that he punched Sillah in the face during his arrest. The basic question for an excessive force claim under the Fourth Amendment is whether the officer used "greater force than was reasonably necessary." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016). This determination is made from the perspective of a reasonable officer in light of the totality of the circumstances known to the officer, without regard to the officer's intent or his subjective beliefs. *Williams v. Indiana State Police Dept.*, 797 F.3d 468, 472–73 (7th Cir. 2015); *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 724 (7th Cir. 2013).

Two pieces of evidence support the excessive force claim. First is a cell phone video taken from a window of Carter's house by Sillah's younger sister, in which Sillah can be heard yelling that he had been punched in the face. Second is the testimony of Sillah's younger brother, who testified that, while standing at the same window from which the video was recorded, he saw Loredo punch Sillah while Sillah was handcuffed and standing on the sidewalk. Sillah's siblings did not disclose this evidence until August 2023, more than three years after Sillah's arrest.

The city defendants do not dispute that the alleged punch would constitute an excessive use of force in violation of Sillah's clearly established Fourth Amendment rights. Rather, they contend that no reasonable jury could find the estate's evidence credible. The city defendants contend that the testimony of Sillah's younger brother is "inherently unreliable" because he was 11 at the time of Sillah's arrest and death, but did not come forward with his testimony until more than three years after the traumatic events. Dkt. 122, at 40. The city defendants argue that the video does not corroborate Sillah's brother's unreliable testimony because it does not show Sillah being punched. Sillah can be heard on the video shouting that he had been punched, but they contend that the recorded statement is insufficient to raise a genuine factual dispute.[3] Loredo denies that he punched Sillah, and neither the other officers nor Carter saw the alleged punch.

Again, the city defendants have a good argument for the jury. But the testimony of Sillah's little brother is not so incredible or implausible that the court may decide his credibility at summary judgment. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (rejecting

[3] The city defendants do not object to the video as hearsay, so the court does not consider that issue.

defendant's argument that the plaintiff's affidavit was insufficient to create a genuine dispute of material fact at summary judgment because the affidavit was "not based on speculation, intuition, or rumor" and the determination of whether the plaintiff's account was less credible than defendants' account was a question reserved for the jury). The court will deny the city defendant's motion for summary judgment against Loredo on the estate's excessive force claim because the role of determining the credibility of witnesses is reserved for the jury.

The estate's amended complaint suggests that the estate intended to bring failure to intervene claims against the other three officers at the scene. The city defendants moved for summary judgment on the failure to intervene claims, but the estate did not respond on the issue. The point is forfeited. The court will grant summary judgment in favor of Massey, Lawrence, and Dahms on the estate's failure to intervene claims.

**b. The failure to thoroughly search Sillah on his initial arrest**

The estate contends that Massey, Lawrence, Dahms, and Loredo acted unreasonably by failing to thoroughly search Sillah when they arrested him. The estate contends that the officers had notice that Sillah was suicidal and that reasonable officers under the circumstances would have been aware of the need to thoroughly search Sillah to check for pills that he could have used to harm himself.

The Court of Appeals has set out the following four-part test for analyzing objective reasonableness in cases involving an alleged violation of the right to protection under the Fourth Amendment: (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant failed to abate the risk, a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making

the consequences of the defendant's conduct obvious; and (4) the defendant's decision caused the plaintiff's injuries. *Kemp v. Fulton County,* 27 F.4th 491, 496–97 (7th Cir. 2022). The critical points here are whether a reasonable officer under the circumstances would have appreciated the high degree of risk involved in not conducting a thorough search of Sillah, and whether the consequences of not doing so were obvious.

The city defendants do not dispute that Carter told the officers that Sillah likely had pills hidden on his person, probably near his groin. The officers knew that Sillah was grieving, high, and disruptive. But there is no evidence that Carter told the officers what kind of pills Sillah had stolen from his grandmother and there is no evidence that either Sillah or Carter warned that Sillah was suicidal.

Lawrence attempted to search Sillah once he was handcuffed and was able to search his clothing well enough to conclude that there were no apparent weapons. But Sillah resisted Lawrence's search of his groin area, and the officers decided to place Sillah in Massey's squad car and transport him to JRC without searching Sillah's underwear for the pills. The decision that the officers faced during Sillah's arrest was whether to strip search a minor on the side of the road in early February or allow him to ride to JRC with the pills still potentially on him. Under those circumstances, it was reasonable for the officers to decide not to strip search Sillah at that moment; the consequences of not conducting an intrusive search were not obvious.

The court will grant the city defendants' motion for summary judgment on the estate's claim against Loredo, Massey, Lawrence, and Dahms concerning their search of Sillah incident to his arrest.

### 2. Transfer to county custody and Sillah's first stay at JRC

#### a. Failure to provide medical care and failure to protect claims against Massey, Lawrence, and Dahms

The estate contends that Massey, Lawrence, and Dahms acted unreasonably by failing to do two things: (1) take Sillah for medical clearance before leaving him at JRC and (2) ensure that he was thoroughly searched.

##### i. Failure to provide medical care

The estate's claim about failing to take Sillah for medical clearance is comparable to a failure to provide medical care claim, which involves a slightly different four-part test for assessing objective reasonableness: (1) whether the defendant had notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns. *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). "[T]he Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Id.*

The estate contends that the officers should have taken Sillah for medical clearance before leaving him at JRC to address two serious medical needs: (1) he was intoxicated and (2) he was at risk of suicide.

As for the contention that the officers should have taken Sillah for medical clearance because he was intoxicated, there is ample evidence that Sillah was intoxicated. Brozek testified that she requested that the officers take him for medical clearance before they left JRC because it appeared that Sillah was intoxicated, and she wanted him to be checked out before she took custody of him. Brozek asserts that the officers refused this request. The officers dispute this.

For purposes of deciding the motions for summary judgment, the court will credit the testimony and draw inferences in favor of the estate for the specific summary judgment motion at issue, which here means crediting Brozek's version of events.[4] Video of the officers walking Sillah into JRC and putting him into the holding cell shows him having trouble keeping his head up, swaying while standing, and having difficulty getting his sweatshirt off, which supports the inference that Sillah was visibly intoxicated when he arrived at JRC. Because Carter informed the officers that Sillah had taken Xanax earlier in the day, a jury could reasonably infer that Sillah was under the influence of Xanax when he arrived at JRC and that the officers knew it.

But that inference does not establish that the officers were on notice that Sillah had a serious medical need. "An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quotation marks and citation omitted). When the officers left Sillah at JRC, he was able to stand and move around under his own power. He was not so incapacitated that it would have been obvious to a layperson that he needed medical attention. It might have been Center policy to have any intoxicated youth sent for medical clearance, but that policy does not establish that intoxication is necessarily a serious medical need. And the estate points to no authority that it is.

---

[4] The city defendants contend that "a dispute of fact is hardly genuine if at the summary judgment stage plaintiff is asserting fundamentally opposing factual positions in its response to the City Defendants' motion for summary judgment and the County Defendants' motion for summary judgment." Dkt. 183, at 12. The court recognizes potential unfairness in allowing a plaintiff to twist the facts to suit the need, but both versions of this fact are exclusively within the knowledge of defendants. There is conflicting evidence about the fact in question, and the estate is not responsible for that conflict.

As for the contention that Sillah was at risk of suicide, the city defendants do not dispute that someone who is suicidal has a serious medical need. But they contend that the officers did not have notice that Sillah was suicidal when they left him at JRC on the evening of February 10. The cases cited by the estate involve officers who were expressly warned of a potential risk of suicide, either by the arrestee himself or people close to him. But neither Sillah nor Carter told the officers that he was suicidal or at potential risk of suicide.

The estate contends that the following information put the officers on notice that Sillah was suicidal: (1) he had recently lost a close family friend, (2) he admitted to taking pills earlier in the day and Carter said he was "high and out of his mind," and (3) he was making comments that, according to the estate, suggested he was trying to commit suicide by cop. This information is sufficient to put the officers on notice that Sillah might try to consume more drugs to deal with his grief, but an officer faced with this information would not be on notice that Sillah was at risk of suicide. Without other signs that an arrestee who recently lost a close loved-one is suicidal, the fact that the arrestee is grieving a recent loss is insufficient to put officers on notice of a risk of suicide. *See Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020). The fact that the officers knew Sillah had taken Xanax earlier in the day would not suggest to a reasonable officer that Sillah was suicidal because there was no evidence that he took a large amount or was trying to overdose. The officers knew that Carter believed the amount Sillah took had affected his behavior, but the estate does not dispute that the officers did not think he was impaired when they spoke to him before his arrest. Sillah said the officers would need a "gun or taser" to take him into custody, but he did not make any comments about wanting to die, so this is a long way from suggesting suicide by cop. Many arrestees make resistive statements without being suicidal.

The combination of Sillah's grief, prior ingestion of Xanax, and his resistive behavior suggest that Sillah was mentally unwell and needed help, which is what officers Massey, Lawrence, and Dahms tried to provide. The estate has not adduced evidence that a reasonable officer knowing those facts under the circumstances here would have known that Sillah was at risk of suicide. The court will grant summary judgment to the city defendants on the claims based on officers Massey, Lawrence, and Dahms failure to take Sillah for a medical clearance.

Even if officers Massey, Lawrence, and Dahms were not entitled to summary judgment on the merits, they would be entitled to qualified immunity. The estate has pointed to no binding case on closely analogous facts that clearly establish a right to medical care under these circumstances. And the general principle that an officer may not ignore an arrestee's apparent risk of suicide does not apply with obvious clarity to the circumstances here.

**ii. Failure to protect from self-harm**

As for the estate's claim that the officers failed to protect Sillah by leaving him in the holding cell without conducting a thorough search, the dispositive issue is again whether the officers had notice that Sillah was at risk of self-harm. There is no clearly established right to be searched while in police custody; but the Constitution requires that officers take reasonable measures to abate a substantial risk created by an officer's decision about the conditions of an arrestee's confinement. *Kemp*, 27 F.4th at 496–97. As discussed above, the officers were aware that Sillah was grieving a loss, behaving erratically, and had taken some amount of unprescribed Xanax earlier in the day because he was feeling sad. The officers were also aware that Sillah's mother thought that he could have more pills on him, hidden in his underwear. And they knew that Sillah had specifically resisted a search of his groin area when he was arrested. There is also evidence that the normal procedure for youth being dropped off at the Center was that

law enforcement officers would search the youth before leaving the youth in the county's custody. But there is no evidence that the officers knew that Sillah was suicidal, or that the pills Sillah might still have included opioids or any other likely means of suicide.

Whether the officers' decision to leave Sillah in the cell without searching him was reasonable is a close call. But the estate has not adduced evidence that it would have been obvious to a reasonable officer under the circumstances that leaving Sillah at JRC without searching him created a high degree of risk that he would harm himself. Again, the estate has not pointed to any binding case on closely analogous facts to demonstrate that the officers violated Sillah's clearly established rights. And because it was not apparent that Sillah was at a significant risk of suicide, the general principle that an officer may not ignore such a risk does not apply with obvious clarity to the circumstances here. The court concludes that officers Massey, Lawrence, and Dahms are entitled to qualified immunity on the estate's claim for failure to protect from Sillah from self-harm.

**b. Failure to protect and failure to provide medical care claims against Brozek, Baratz, Moorad, and Schaetz**

The estate contends that the staff who were working at the Center when Sillah was brought to JRC—Brozek, Baratz, Moorad, and Schaetz—acted unreasonably by failing to do two things: (1) thoroughly search Sillah before allowing the officers to leave him in the holding cell and (2) adequately monitor him to prevent him from ingesting pills once he removed them from his pants in the holding cell. The four JRC employee defendants that interacted with Sillah on February 10 had different roles, so the court will consider the estate's claims against each defendant separately.

**i. Brozek**

Brozek was a juvenile court counselor at JRC responsible for Sillah's intake at JRC. By the time that Sillah arrived at JRC on the night of February 10, Brozek had already spoken to the arresting officers and learned that Sillah had taken Xanax earlier in the day, but that the officers did not believe it was necessary to take him for medical clearance. Brozek had also called and spoken to Carter. Brozek learned from her that Sillah potentially had a bag of pills that he had gotten by breaking into her safe and the safe of his grandmother earlier in the day. The parties dispute exactly what Carter told Brozek about the pills that Sillah had taken. If the court credits Carter's testimony, as it will on defendants' motions for summary judgment, Carter also informed Brozek that the missing pills included 20 oxycodone, 20 Xanax, and 10 morphine. Dkt. 73 (Carter Dep. 75:13–76:6).

Brozek testified that the officers had told her that they had not fully searched Sillah because Massey and Lawernce are women. A reasonable jury could reasonably infer from this testimony that Brozek knew that there was a risk that Sillah still had pills hidden on him, and that Sillah was therefore at risk of taking more. But Brozek did not refuse to take custody of Sillah until he was searched or ask the officers to search him again before they left him alone in the holding cell.

Whether it was reasonable for Brozek to take custody of Sillah without ensuring that he had been thoroughly searched is a close call. But the court concludes that Brozek is entitled to qualified immunity regardless. An arrestee has no general right to be searched when taken into custody. And Brozek's own ability to address any risk arising from the failure to search Sillah is limited because there's no evidence that she had the capacity to search Sillah herself or that authority to order it done. Brozek had a duty to act reasonably to protect Sillah from

apparent risks of self-harm and to provide adequate medical care, but she did not have "a free-floating obligation to put things to rights." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). The undisputed evidence shows that Brozek was trying to help Sillah by collecting information from Carter and calling the arresting officers to try to get someone to transport Sillah for medical clearance. Brozek's conduct is not analogous to cases where defendants simply chose to do nothing in response to a known substantial risk of harm or serious medical need. The estate does not identify any analogous cases that would show that Brozek's conduct violated Sillah's clearly established constitutional rights. Nor does the estate identify a general constitutional principle clearly applies to the circumstances Brozek faced. The court will grant summary judgment on the estate's claim against Brozek based on her failure to have Sillah searched because she is entitled to qualified immunity.

**ii. Baratz**

Baratz was a limited term employee working as a receptionist at JRC when Sillah was brought in. Baratz had a monitor on his desk that showed Sillah in the holding cell. Baratz was the first person at JRC to realize that Sillah had contraband in the holding cell, and he went to Sillah's cell and took the pills away from him.

The estate does not clearly identify what conduct by Baratz it contends is unreasonable. The court understands the estate's theory to be that Baratz had the same information as Brozek about Sillah, so he should have inferred that Sillah was at risk of suicide. But the estate adduces no evidence that Baratz knew that there was a risk that Sillah had pills hidden on him when he was in the holding cell. So the claim that Baratz acted unreasonably in light of that information is unsupported by evidence.

The estate also contends that Baratz should have confiscated the contraband pills immediately, rather than almost 20 minutes after Sillah pulled the pill bottle out of his pants. The estate's theory is that either Baratz failed to monitor the video surveillance Sillah's cell, or he simply ignored the visible contraband. But Baratz was a receptionist, not the JRC worker responsible for monitoring Sillah. There is no evidence that monitoring youth in JRC was part of Baratz's duties as a receptionist; Baratz was not liable for taking on another employee's job of monitoring Sillah's conditions of confinement merely because he was present at JRC. *See Burks*, 555 F.3d at 595 ("Bureaucracies divide tasks; no [plaintiff] is entitled to insist that one employee do another's job.").

The estate also seems to contend that Baratz acted unreasonably when he turned the confiscated pills over to Brozek and then left when his shift ended at 10:30 pm, without doing anything else to search Sillah. But there is no evidence that Baratz was aware that Sillah still had pills hidden on him, so it was reasonable for him to report what he knew to Brozek because she was the person responsible for monitoring Sillah and his intake. In sum, the estate has not offered evidence from which a reasonable jury could find that Baratz acted unreasonably. The court will grant the county defendants' motion for summary judgment on the claim against Baratz.

**iii. Moorad**

Moorad's interactions with Sillah were limited to the approximately 10 minutes during which he tried to convince Sillah to cooperate with intake and move into Detention. In that limited interaction, Sillah made comments about wanting to die and that he would take pills that he had on him. Moorad saw that Sillah had pills in his hand, which Sillah swallowed when

Moorad opened the cell door. Moorad immediately reported this to Brozek and Schaetz, who at that point were both in JRC.

The estate contends that it was not reasonable for Moorad to leave JRC when he had just seen Sillah take unknown pills. The estate argues that a reasonable person in Moorad's position would have stayed to help Sillah because he knew both that Sillah needed immediate medical treatment and that Sillah still had not been thoroughly searched to remove any other pills that he might still have hidden on him. But Moorad did not simply abandon Sillah or leave him without aid. Moorad passed on the pertinent information about Sillah's now known serious medical need to Brozek and Schaetz. Moorad knew that they were both working to get Sillah to the hospital for treatment and were able to monitor Sillah until the paramedics and officers arrived. Any attempt to conduct a strip search at that point risked delaying the medical treatment. No reasonable jury could find Moorad's conduct to be objectively unreasonable. The court will grant the county defendants' motion for summary judgment on the claim against Moorad.

**iv. Schaetz**

Schaetz started his shift at 11:00 pm, so his interactions with Sillah on the night of February 10 were also limited. Schaetz helped Brozek communicate with Wege, the dispatcher, about having officers transport Sillah to the hospital, and then he went to speak with Sillah to tell him that he would be transported to the hospital. When Schaetz was talking to Sillah, Sillah said that he would "take the rest of these Percocets then," and put his hand to his mouth, but Schaetz could not see if he actually took any additional pills. Dkt. 97 (Schaetz Dep. 88:8–15). As with Moorad, it would have been unreasonable to attempt to search Sillah at that

point because that could have delayed necessary treatment. The court will grant the county defendants' motion for summary judgment on the claim against Schaetz.

#### c. Failure to provide medical care claim against Brozek, Baratz, Moorad, and Schaetz

The estate contends that Brozek, Baratz, Moorad, and Schaetz acted unreasonably by not immediately calling 911 to get Sillah treatment for an overdose as soon as Sillah could be seen ingesting pills on the video of his holding cell. But the estate adduces no evidence that any of the Center employee defendants actually saw Sillah swallow pills on the video, which occurred about 10:40 pm. The evidence is that the county defendants first had notice that Sillah had taken pills is when Moorad observed him swallow a handful of pills at 11:05 pm. Baratz had left JRC at the end of his shift at 10:30 pm, so he cannot be liable on this claim.

As for Brozek, Moorad, and Schaetz, there is no evidence that they unreasonably delayed in attempting to get help for Sillah. Moorad immediately notified Brozek that Sillah had taken the pills, and Brozek moved promptly to get Sillah medical care. Brozek tried calling the officers before she called 911, to try to have them come back and take Sillah to the hospital. Under the circumstances, it was reasonable for Brozek to believe that it could be quicker to have the officers take Sillah to the hospital rather than to wait for paramedics to come. In any case, paramedics arrived by 11:33 pm. No reasonable jury could find that the Center employee defendants behaved unreasonably once the learned that Sillah had take pills in the JRC. The court will grant summary judgment on the estate's claim against Brozek, Baratz, Moorad, and Schaetz based on failure to provide medical care.

### 3. First visit to Meriter

#### a. Failure to provide medical care against Wege

The estate contends that sergeant Kurt Wege, the dispatcher, acted unreasonably by telling officers that Sillah should have a mental health assessment and then failing to ensure that Sillah received the assessment. Wege's role in the events related to Sillah is limited, and the estate's argument about Wege's conduct is underdeveloped. *See* Dkt. 172, at 50–51. In sum, Wege was the supervising officer on duty when staff at JRC were reaching out to the Madison Police Department about Sillah ingesting pills. Wege told them to call 911 and dispatched two officers to JRC to help with transport and another two officers to assist at Meriter. The estate's theory appears to be that Wege learned Sillah was suicidal from his call with JRC and decided that he should be assessed for a potential emergency detention to address his mental health crisis. The estate asserts that Wege "ordered" the officers he dispatched to transport Sillah to contact Journey Mental Health to request an emergency detention. Dkt. 182, at ¶ 648. The estate contends that Wege unreasonably failed to follow up to ensure that Sillah received a mental health evaluation the next morning when he learned that Sillah had been discharged from Meriter without an assessment.

But the evidence that the estate cites to support its assertion that Wege ordered the other officers to have Sillah evaluated for a mental health detention does not show that Wege issued any such order. And, even if the court accepts the estate's assertion that Wege had issued such an order and that Wege learned the next morning that Sillah had not been assessed, there is no evidence that Wege made any unreasonable decisions about Sillah at that point. The notes that Wege received the next morning said, "Sillah was medically cleared and returned to JRC around 2:30 AM." Dkt. 196-6, at 2. Wege never personally interacted with Sillah, and

it was reasonable for Wege to rely on the judgment of the medical professionals who treated Sillah and assume that Sillah was medically cleared for release back to JRC. *See Est. of Perry v. Wenzel*, 872 F.3d 439, 458 (7th Cir. 2017) (officers who are not medical professionals "were entitled to rely upon the nurses' professional judgment without subjecting themselves to § 1983 liability"). Because there is no evidence that Wege acted unreasonably, the court will grant the summary judgment on the estate's claim against Wege.

**b. Failure to provide medical care and failure to protect claims against officers Marino, Lathrop, Misener, and Dahms**

The estate contends that officers Catherine Marino, Brittney Lathrop, Elijah Misener, and Dahms acted unreasonably by failing to inform the medical providers at Meriter what types of medication Sillah could have ingested, by failing to search Sillah's clothing for additional pills once hospital staff undressed him, and by failing to seek a mental health evaluation to determine whether Sillah should be put in emergency detention.

As for the estate's claim based on the alleged failure to pass on necessary information to Sillah's medical providers about the types of medications Sillah could have taken, there is no evidence that any of these officer defendants had information to pass on that was not already known to the medical providers. Marino and Lathrop were the officers that accompanied Sillah and the paramedics from JRC to Meriter, but they arrived at JRC after the paramedics. And Dahms and Misener met the other officer and Sillah at Meriter. The Center defendants who interacted with the paramedics knew about Sillah's statements about having Percocet and the list of missing medications that Sillah could have in his possession. So none of the officer defendants who were at Meriter for Sillah's first visit there had any additional information to convey to the medical providers at Meriter. Nor is there any evidence that the

alleged failure to pass on information about the types of medications Sillah could have taken caused him any harm. The doctor who treated Sillah testified that the team at Meriter approached the situation as an overdose on unknown medications, and the estate offers no evidence that the course of treatment would have been different if the providers knew exactly what drugs he took.

As for the estate's claim concerning the alleged failure to search Sillah's clothing, the estate's theory is even more attenuated than its claims based on defendants' choice not to search Sillah when he was in custody earlier. There is circumstantial evidence to establish that Sillah's original clothing must have contained additional pills. There is also no dispute that Sillah had pills when he returned to JRC in hospital-provided clothing; video from the morning of February 11 shows Sillah pulling a bottle of pills from pocket of his shirt and Mendoza picking up a pill that had rolled under the door of the cell, which was later identified as oxycodone. After Sillah had been taken back to Meriter a second time, another pill was found in cell R2, where he had been held during his second visit to the Center, when he had been returned from Meriter in a diaper and paper hospital scrubs. That pill was later identified as extended-release morphine. None of the parties has presented evidence that explains how Sillah came to have pills with him when he was held in cell R2.

The estate argues that the only way that Sillah could have had pills with him in cell R2 is that the pills were hidden in his clothing when Meriter staff placed that clothing in a bag, and that Sillah somehow had unsupervised access to the bag at some point. The estate contends that Sillah's death would have been prevented if the officers had searched his clothes at Meriter, which would have prevented him from taking more pills after he was returned to the Center.

It's reasonable to infer that Sillah must have had more pills hidden in his clothing when Meriter staff undressed him.[5] But that is a different question from whether a reasonable officer under the circumstances would have been aware of the need to search Sillah's clothing. The officers now had notice that Sillah had attempted suicide. But to be aware of the risk of Sillah overdosing on the hidden pills, the officers would have had to know that there was a potential that Sillah had not already taken all the pills he had when he was arrested, have to assume that the hospital staff did not find the hidden pills when removing Sillah's clothing, and believe that Sillah might have unsupervised access his clothes to retrieve the pills. This does not add up to an obvious risk. Under the circumstances, the officers' failure to search Sillah's clothing was not unreasonable.

As for the estate's claim that the officers failed to provide medical care by not having Sillah assessed for a mental health emergency detention, the estate offers no evidence that that caused any of the harm that Sillah suffered. The estate contends that if Sillah had been evaluated, he would have been detained and that would have interrupted the chain of events that led to his death. But there is no constitutional right to be involuntarily committed. *Wilson v. Formigoni*, 42 F.3d 1060, 1066 (7th Cir. 1994); *Collignon v. Milwaukee County*, 163 F.3d 982, 991 (7th Cir. 1998) (explaining that a person who committed suicide after being released from custody to his parents "had no due process right to be involuntarily committed"). But even if the court assumes that a reasonable officer would have sought to get Sillah a mental health assessment to provide him with adequate medical care, the estate has not adduced any evidence

[5] The parties seem to agree that it was very unlikely that Sillah had the pills hidden in a body cavity because the liquid activated charcoal used to treat his overdose caused him to vomit and have extensive diarrhea, which the officers observed while he was at Meriter.

that had Sillah been assessed for an emergency detention, he would have actually met the criteria for an involuntary commitment.

To prove causation for a claim under § 1983, the estate must show that the officers' decision was both the cause-in-fact and the proximate cause of Sillah's harm. *Hunter v. Mueske*, 73 F.4th 561, 568 (7th Cir. 2023); *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012). For an act to be the proximate cause of an injury, the injury must be a reasonably foreseeable consequence of the act. *Id.* Sillah was already under the care of providers at Meriter. Those providers would have been in a better position than the officers to recommend further treatment or assessment. Given the circumstances, Sillah's later pain, suffering, or death were not reasonably foreseeable consequences of the officers' decision, if it was as decision, not to seek a further mental health evaluation.

The court will grant summary judgment on the estate's claim that these defendant officers violated Sillah's Fourth Amendment rights by not seeking to have Sillah evaluated for an emergency detention.

**4. Transfer back to county custody**

**a. Failure to protect against Dahms concerning Sillah's access to his clothes**

Dahms was the officer who drove Sillah back to JRC and he was carrying the bag with Sillah's clothes when they entered the detention area. The estate contends that Dahms failed to protect Sillah by letting him have access to the bag with his clothes. The problem with this claim is the same evidentiary gap discussed above: the evidence does not show how Sillah came to have pills after he was brought back to JRC wearing only a diaper and paper hospital scrubs. The estate contends that Dahms acted unreasonably by giving Sillah access to his clothes,

either at Meriter, in the car during transport back to JRC, or in Sillah's cell once he was back at the Center.

But there is no evidence that Dahms made any intentional decision to let Sillah gain access to his clothing. The estate's speculation that Dahms could have left the bag of clothing in Sillah's cell is contradicted by testimony from both Dahms and Schaetz that he left the bag outside the cell. This leaves the estate's theory that Sillah could have accessed the bag while at Meriter or in the car while being transported back to JRC. Dahms testified that he would have put the bag in the trunk of his car or in the front passenger seat because he has never put an arrestee's personal property in the back of the car with an arrestee. Dkt. 57 (Dahms Dep. 166:1–23). The estate's only argument in response to Dahms's testimony is that Sillah must have had access to the bag at some point when he was in Dahms's custody because that is the only explanation for how he ended up with the pills in the cell.

This argument would support a claim that Dahms (or the other city defendants at the first visit to Meriter) was negligent in failing to prevent Sillah gaining access to the bag with his clothes. But proof of intentional conduct is necessary to establish a Fourth Amendment claim. *Pittman*, 108 F.4th at 570. The estate has not identified any intentional decision by Dahms that resulted in Sillah having pills in his cell the second time he was in the county's custody. The court will grant summary judgment on the estate's failure to protect claim based on the theory that Dahms gave Sillah access to his clothes after the first visit to Meriter.

**b. Failure to protect claim against Dahms and Misener concerning their communications with the defendant Center employees**

The estate contends that officers Dahms and Misener acted unreasonably by failing to provide Schaetz and Mendoza information about Sillah's discharge instructions. Specifically,

the estate contends that Dahms and Misener did not tell Schaetz and Mendoza that Sillah's doctor had said Sillah was suicidal and needed to be placed in a secure room where he could not harm himself. The estate also contends that Dahms and Misener falsely stated that Sillah was "too groggy" to be evaluated for a potential emergency detention. The estate reasons that at least Dahms knew that it was not true that Sillah was "too groggy" for an evaluation because he later said to Schaetz that Sillah was "probably acting." Dkt. 173-25, at 135; Dkt. 173-27, at 8.

Even if the court assumes that Dahms and Misener acted unreasonably by failing to relay information from Sillah's doctor and by falsely asserting that Sillah could not be evaluated for an emergency detention, the estate has no evidence that this unreasonable conduct harmed Sillah. The Center defendants who took custody of Sillah knew that he had attempted suicide and was at risk of future suicide attempts, and they took that into account when they placed him in a cell where they could monitor him. In addition, Schaetz testified that he reviewed Sillah's discharge papers, so he was aware of Sillah's diagnosis and the discharge instructions from the medical providers. And the Center defendants could communicate independently with Journey and seek to have Sillah evaluated for a potential emergency detention if they thought it was appropriate. Schaetz even testified that he was skeptical of Dahms's statement about Sillah "acting" and was concerned that Sillah needed further medical care. So there is no evidence that any unreasonable statements from Dahms or Misener affected the treatment or care that Sillah received at the Center The court will grant summary judgment on the estate's claim based on communications between Dahms and Misener and the Center defendants when the officers transferred Sillah to Center custody for the second time.

**c. Failure to protect claims against Schaetz, Mendoza, Meek, and Nofodji**

The estate contends that Schaetz, Mendoza, Meek, and Nofodji acted unreasonably by failing to search Sillah before he was placed in cell R2 in Detention and by failing to adequately monitor him despite knowing that he was at risk of suicide. Schaetz and Mendoza were the staff of JRC and Detention, respectively, when Sillah was brought back to the Center, and both of their shifts ended at 7:00 am. Meek's and Nofodji's shifts began at 7:00 am. The court will begin with the claims against Schaetz and Mendoza related to when Sillah first got back to the Center and then turn to the claims against Meek and Nofodji.

**i. Schaetz and Mendoza**

Schaetz and Mendoza were both aware that Sillah was at risk of suicide when he was returned to Center custody. Sillah had not completed the intake process that normally precedes placement in Detention, and Schaetz did not put him on a formal suicide watch. But Schaetz had placed Sillah in cell R2 in Detention instead of in the JRC holding cell so that he and Mendoza could monitor Sillah. Schaetz testified that "it didn't seem like [Sillah] was in any condition to be released and to be released to our care, specifically to be detained." Dkt. 97 (Schaetz Dep. 152:1–6). Because Sillah had returned from the hospital in a diaper and paper scrubs that the hospital had provided, Schaetz and Mendoza did not have any information that would have put a reasonable person on notice that Sillah might still have pills hidden on him when he was put in R2. But a reasonable jury could find that Schaetz and Mendoza were both aware that Sillah needed to be closely monitored because he was at risk of harming himself.

The estate contends that Schaetz and Mendoza unreasonably failed to monitor Sillah when he woke up and began moving around his cell around 6:00 am, and that the lax

monitoring allowed him to take yet more pills. The estate contends that video of Sillah between 6:00 am and 7:00 am, when Schaetz and Mendoza ended their shifts, contains at least four instances when pills or a pill bottle are visible. The estate argues that the pills being visible on the video means that Schaetz and Mendoza would have been aware that Sillah had the pills if they had been monitoring him. They either knew that Sillah had the pill bottle but decided not to do anything about it, or they were unreasonably lax in monitoring Sillah for the last hour of their shift. Furthermore, the estate contends, Mendoza had indisputable notice that Sillah had access to pills when, at 6:40 am, she picked up a pill that had rolled out of his cell. It was unreasonable, so the argument goes, not to search Sillah and the cell at that point.

The estate's claims against Schaetz and Mendoza fail for two reasons. First, there is no evidence that Schaetz or Mendoza actually saw that Sillah had pills in the cell or that they were lax in monitoring him. The estate assumes that anyone properly monitoring Sillah would have realized that he had pills, presumably because the pill bottle and pills were visible on the surveillance video. But the pills and bottle are visible only for a few seconds. Schaetz and Mendoza might have been diligently monitoring Sillah but still missed the moments when the pills or pill bottle was visible. Schaetz testified that he and Mendoza "did regular room checks on" Sillah and that Mendoza had a monitor on her desk to watch Sillah's cell. Dkt. 97 (Schaetz Dep. 154:8–14). Mendoza testified that she was watching Sillah on video when at her desk and that when she regularly got up to do checks of the other youth in Detention she would check on Sillah through the window of his cell. Dkt. 112 (Mendoza Dep. 56:8–21, 89:10–18).

Second, even if Schaetz and Mendoza had failed to reasonably monitor Sillah, there is no evidence that their failure to monitor harmed Sillah. The estate contends that Schaetz and Mendoza should have known that Sillah had pills by 6:16 am because by that time the pills

were visible on the video of the cell. Within a minute or two of Watson starting his 7:00 am shift, Watson called 911 for emergency help because Sillah may have taken pills. Dkt. 88 (Watson Dep. 74:22–75:3, 79:15–80:1). Sillah was again admitted to Meriter within an hour of Watson's call. This means, accepting the estate's theory, that Schaetz and Mendoza lax monitoring produced at most a 45-minute delay in getting medical care for Sillah. The estate adduces no evidence that Sillah was harmed by that 45-minute delay in being taken to Meriter.

The court will grant summary judgment on the estate's claims against Mendoza and Schaetz based on the deficiency of their monitoring of Sillah on the morning of February 11.

**ii. Meek and Nofodji**

As for Meek, there is no evidence that he made any intentional decision about the conditions of Sillah's confinement or otherwise took any actions that could be the basis for a Fourth Amendment violation. Meek arrived at the Center at 6:00 am, but at that point both Schaetz and Mendoza were still on duty monitoring Sillah. The estate does not offer any evidence that Meek was also responsible for monitoring Sillah, or that he could have known that Schaetz and Mendoza were not doing so.

As for Nofodji, she arrived after Watson had called paramedics to take Sillah for medical clearance. There is no evidence that she interacted with Sillah or made any decisions related to the conditions of his confinement when he was at the Center on the morning of February 11.

The court will grant summary judgment on the estate's claims against Meek and Nofodji.

#### 5. Second visit to Meriter

##### a. Claim for failure to protect and failure to provide medical care claims against officers Dornan, Stelter, and Lindsey

The estate contends that officers Dornan, Stelter, and Lindsey acted unreasonably by failing to convey pertinent information to medical staff when they accompanied Sillah to Meriter on the morning of February 11. The estate also contends that Dornan, the primary officer on the scene who was communicating with medical providers and other parties, acted unreasonably by not seeking to have Sillah evaluated for emergency detention while he was at Meriter.

As for the alleged failure to provide pertinent information, the estate contends that the officers did not inform the paramedics and hospital staff that Sillah said he took an "oxy pill and an opiate," that he was making suicidal comments, and that an extended-release morphine and oxycodone pill had been found in Sillah's cell. But testimony from the paramedics who treated Sillah at the scene and his medical records from Meriter show that Sillah himself told the paramedics that he had taken oxycodone and Xanax. Dkt. 94 (Schecklman Dep. 14:13–23); Dkt. 169-8, at 144, 159, 172. So even if the officers failed to convey that information, there is no evidence that their conduct affected Sillah's care in any way. Likewise, the doctor that treated Sillah during his second visit to Meriter was aware that he had been making suicidal statements. Dkt. 86 (Viet Dep. 43:14–19). So there is no evidence that his care was affected by whether the officers specifically communicated to the medical providers that Sillah has been making suicidal comments. There is also no evidence that any of the officers knew that an extended-release morphine pill had been found in Sillah's cell. Because the officers could not

communicate information that they did not have, it was reasonable for them to not tell the medical providers that Sillah had morphine in his cell.

As for Dornan not ensuring that Sillah had a mental health evaluation for a potential emergency detention, this claim has the same causation problem as the estate's claim that the other city defendants should have gotten Sillah a mental health assessment. Even if Dornan could have unilaterally ensured that Sillah was evaluated by someone from Journey, there is no evidence that the result of such an assessment would have been to place Sillah in emergency detention. Without such evidence, the estate cannot link Sillah's death to Dornan's alleged failure to seek an emergency detention evaluation.

The estate contends that there is evidence Dornan did not want to take the time to remain with Sillah through the emergency detention process and that he has made false statements about his communications with the doctors at Meriter, someone from Journey, and Carter concerning whether Sillah needed to go through an emergency detention evaluation. But these factual disputes are not material because even if Dornan was unreasonable in not seeking an emergency detention evaluation, the estate has not provided evidence to show that that decision was the cause of harm to Sillah.

**b. Failure to provide medical care based on decision by Center defendants to release Sillah from custody without a mental health screening**

The estate contends that Nofodji, Bauman, and Pearson acted unreasonably by deciding to release Sillah from custody without a mental health evaluation for potential emergency detention when they knew he was suicidal. As discussed above, there is no constitutional right to be kept in custody. *Wilson*, 42 F.3d at 1066. So, the county defendants cannot be liable under the Fourth Amendment simply for their decision to release Sillah from custody. But even

if these claims were framed as a failure to provide medical care while Sillah was still in their custody, these claims fail for the same reason as the estate's claims against the city defendants concerning their decision not to seek emergency detention: the estate has no evidence that Sillah would have been sent to emergency detention even if he had been evaluated.

The estate alleges that Nofodji acted dishonestly in discussing the possibility of emergency detention with Journey, Meriter staff, and Carter. But, like the allegations against Dornan, these allegations are not material without evidence that Sillah would have been detained if he had been evaluated.

The court will grant summary judgment on the estate's claims against Nofodji, Beauman, and Pearson.

**C. Municipal liability**

The estate's amended complaint alleges a *Monell* claim that the city of Madison and Dane County had policies "that were the moving force of the deprivation of plaintiffs' constitutional rights." Dkt. 68, ¶ 295. The city moved for summary judgment on the *Monell* claim, but the estate's opposition brief did not address the city's arguments. The *Monell* claim against the city is forfeited. The court will grant summary judgment to the city on that claim.

As for the county, the estate contends that it adopted an express policy of deciding not to have a suicide watch policy for JRC, despite knowing that youth brought to JRC could be at risk of suicide while in custody.

To prove its claim against the county, the estate must show four things: (1) a constitutional deprivation; (2) action or inaction by the municipal defendant or its employees that can be fairly described as the municipality's policy; (3) notice to the defendant that its policy would lead to constitutional violations; and (4) a direct causal connection between the

defendant's policy and the constitutional injury. *See Thomas v. Neenah Joint School District*, 74 F.4th 521, 524 (7th Cir. 2023); *Bohanon v. city of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022*); First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986–87 (7th Cir. 2021); *Lapre v. City of Chicago*, 911 F.3d 424, 430–31 (7th Cir. 2018). The estate contends that the county deprived Sillah of his right to adequate medical care by having a policy of not having a suicide-watch protocol for how often staff needed to check on youth brought to JRC who were in holding but had not been processed into Detention. Put more simply, the estate contends that the county is liable for Sillah's death because it chose not to establish a suicide watch policy for youth who had not completed the intake process.

The county acknowledges that it had notice that youth who entered JRC could be suicidal, which is a serious medical condition, and that it has a duty to provide constitutionally adequate medical care for those in its custody. But it contends that it has a policy in place to provide adequate and timely medical care to suicidal youth at JRC. Namely, the county's policy for dealing with a youth at risk of self-harm when brought to JRC is to call the mental health crisis center to have someone from there assess the youth or call either the officer who brought the youth to JRC or EMS to have them take the youth for assessment at a medical facility. Dkt. 59 (Brozek Dep. 150:17–25); Dkt. 100 (Nofodji Dep. 80:15–81:10); Dkt. 109 (Bauman Dep. 92:6–21).

The court concludes that the estate has not provided evidence from which a jury could find that the county had notice that not adopting a policy that suicidal youth needed to be checked every four minutes while in holding at JRC would lead to constitutional violations. The evidence shows that the county has a policy that suicidal youth should not be held at JRC. It is reasonable for the county to expect that staff at the Center would follow that policy, in

which case it did not need to adopt a policy mandating how often staff needed to check on youth who are at risk of suicide. Said another way, the county did not have notice that its failure to adopt a policy for suicide watch monitoring intervals would result in constitutional violations because under its policy youth at risk of suicide should not be in holding at JRC.

The county also asks the court to dismiss as premature the estate's claim that the county is liable for indemnification under Wis. Stats. § 895.46(1)(a). Section 895.46 does not give the estate a private cause of action for indemnification. *Williams v. Michalsen*, No. 19-cv-56, 2020 WL 1939136, at *9 (E.D. Wis. Apr. 21, 2020). But, this court's practice has been to keep the municipal defendants in the case for the purpose of ordering complete relief to the estate. *See Voegeli v. City of Janesville*, No. 20-cv-845, 2021 WL 4501837, at *4 (W.D. Wis. Oct. 1, 2021); *Holte v. City of Eau Claire*, No. 20-cv-131 (W.D. Wis. July 15, 2021); *Estate of Smith by Bryfczynski v. Oneida Cty.*, No. 19-cv-972, 2021 WL 2188220, at *12 (W.D. Wis. May 28, 2021). But the municipal defendants' role in the case will not be disclosed to the jury, because that would be irrelevant and prejudicial. In light of the court's decision here, the issue is moot as it pertains to the county. But the city will be removed from the caption of any trial document that the jury sees, and the parties will not present any evidence or argument about its role as indemnitor.

## CONCLUSION

To sum up, the court is granting in part defendants' motion to exclude testimony from Oakes. The court is granting the estate's motion to withdraw one of its proposed facts. The court is granting summary judgment on all but one of defendants' claims: the claim against

Loredo for excessive use of force during Sillah's arrest cannot be resolved on summary judgment.

ORDER

IT IS ORDERED that:

1. Defendants' motion to exclude testimony of Steven F. Oakes, Dkt. 114, is GRANTED in part. Oakes may testify about his opinions based on his knowledge of pharmacology, including those opinions about the characteristics of the drugs found in the toxicology report and about when Malick Sillah ingested those drugs. All other testimony from Oakes is excluded.

2. The motion for summary judgment by defendants City of Madison, Thomas Dahms, Christopher Dornan, Brittney Lathrop, Sarah Lawrence, Rebecca Lindsey, Javier Loredo, Catherine Marino, Haley Massey, Elijah Misener, Joel Stelter, Kurt Wege, Dkt. 119, is GRANTED in part and DENIED in part as follows:

    a. Summary judgment is granted in favor of Dahms, Dornan, Lathrop, Lawrence, Lindsey, Marino, Massey, Misener, Stelter, and Wege, and they are DISMISSED from the case.

    b. Summary judgment is denied for Loredo.

    c. Summary judgment is granted in favor of the city for the estate's claim that the city has unconstitutional policies.

3. The motion for summary judgment by defendants Aaron Baratz, John Bauman, Amber Brozek, Dane County, Jeff Meek, Melisa Mendoza, Ryan Moorad, Marie Nofodji, Edjron Pearson, Norbert Schaetz, Dkt. 124, is GRANTED.

4. Involuntary plaintiff State of Wisconsin Department of Health and Family Services is DISMISSED.

5. Plaintiff's motion to withdraw fact No. 49 from Plaintiff's Statements of Additional Proposed Facts in Opposition to City & County Defendants' Motions for Summary Judgment, Dkt. 187, is GRANTED.

Entered November 1, 2024.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge